**NAFCO OIL & GAS, INC., et al.,
Appellants,**

**v.**

**TARTAN RESOURCES CORPORATION
et al., Appellees.**

No. 904.

Court of Civil Appeals of Texas,
Corpus Christi.

April 24, 1975.

Rehearing Denied May 15, 1975.

James S. Robertson, Jr., Roach & Robertson, Dallas, C. Kinnear Earl, El Campo, Irvin Moore, Jr., Ingram & Moore, Wharton, for appellants.

Chas. R. Porter, Jr., Porter, Taylor, Gonzales, Thompson & Rogers, Corpus Christi, L. L. Duckett, Duckett, Bouligny & Collins, El Campo, Joseph A. Cohn, Jr., Corpus Christi, for appellees.

## OPINION

YOUNG, Justice.

This is an action in trespass to try title to an oil, gas and mineral leasehold estate which was brought by the lessees under a top lease executed in 1969 against the lessees under a prior lease executed in 1945 based upon the contention by the plaintiffs that the 1945 lease has terminated except as to one well (called the B–1 well) and the oil rights in 20 acres around such well. No question is raised by the plaintiffs with respect to the continuation of the 1945 lease as to the B–1 well and such 20 acres. The defendants filed a plea of not guilty and a general denial. The land in question is situated in Wharton County, Texas.

The plaintiffs in the trial court were Tartan Resources Corporation; Edward M. Carmouche; Charles Carmouche, Trustee for the Edward M. Carmouche Trust No. 1; E. M. Carmouche and Cletus Cribbs, Trustees for Capitol Towing Company, Inc., Trust No. 1. Coastal States Gas Producing Company intervened and adopted the position of the plaintiffs.

The defendants in the trial court were Nafco Oil & Gas Inc., Rio Gas Gathering Company, Inc. and Matagorda Oil Company. C. Kinnear Earl, Trustee for the J. A. Halamicek Trust, was also named as a defendant but adopted the position of the plaintiffs.

Following a trial to the court without a jury, the trial court entered judgment that the plaintiffs and intervenor recover from the defendants the title and possession of the mineral leasehold estate in question. The trial court filed findings of fact and conclusions of law. The record herein includes a Statement of Facts. The defendants (except C. Kinnear Earl, trustee) appeal.

Although the 1945 lease covered two tracts of land (160 acres and 384.5 acres respectively), this action focuses primarily upon the 384.5-acre tract.

J. A. Halamicek is the common source of title of the appellants and appellees. On January 31, 1945, J. A. Halamicek, as lessor, executed an oil, gas and mineral lease to J. B. Ferguson, (appellees' predecessor in title) as lessee, covering the two tracts, heretofore mentioned, from the surface down to a depth of 7,500 feet. The lease was for a primary term of one year from the date of the lease, "and as long thereafter as oil, gas or other minerals" are being produced from land covered by the lease. Paragraph 5 of the lease provided that the lessee would drill two wells to a stated

depth on the leased premises during the calendar year 1945. Paragraph 6 provided that after the completion of such wells the lease would terminate except as to 20 acres around each producing well on such land, unless the lessee continued to drill wells until the land covered by the lease was "developed".

Paragraph 6 of the 1945 lease was amended by instrument dated March 17, 1947. This amendment completely deleted the original paragraph and substituted a new paragraph 6 which provided that after the completion of the two wells to be drilled in 1945, the lease would terminate except as to oil and oil rights in 20 acres around each producing oil well and gas and gas rights in 160 acres around each producing gas well, unless the lessee maintained a continuous drilling program as therein provided until the land covered by the lease was "developed".

The 1945 lease was amended a final time April 15, 1954. By this amendment, lessee agreed to commence within 10 days the drilling of a well on the 384.5-acre tract to a specified depth. The 1954 amendment also deleted paragraph 6, as it read after the 1947 amendment. In lieu thereof, a new paragraph 6 was made a part of the 1945 lease. The new paragraph provided that if more than 90 consecutive days elapsed between the completion of a well, whether a producer or a dry hole, and the commencement of another well on such land, the lease would terminate at the end of such 90-day period as to all land covered by the lease except:

"(a) The oil and oil rights . . . in 20 acres, . . . around each well theretofore completed as an oil well; and

(b) The gas and gas rights . . . in 160 acres, . . . around each well theretofore completed as a gas well, down to and including the sand from which such well produced gas."

The meaning of the new paragraph 6 is the central issue involved in this action.

The well which was to be drilled pursuant to the 1954 amendment was completed in May 1954 as an oil well (called the B–6 well). No well was drilled upon the leased premises within 90 days after that completion. At the expiration of the 90-day period, there were, however, four wells (B–1, B–4, B–5, B–6) producing oil from the 384.5-acre tract and two wells (B–2, B–3) producing gas.

On October 22, 1954, the predecessors in title of appellant Nafco Oil & Gas, Inc. executed a release covering all of the 1945 lease except oil and oil rights in and to 20 acres around each oil well (B–1, B–4, B–5 and B–6) and gas and gas rights in and to 160 acres around each gas well (B–2 and B–3).

The B–5 well is located on the same 160-acre tract as the B–2 well. Wells B–4 and B–6 are both located on the same 160-acre tract as well as B–3. Well B–1 is not located on either of the 160-acre tracts.

Well B–1 has continuously produced oil in paying quantities. Well B–2 ceased production of gas in 1966. The B–3 well ceased production of gas in 1965. The B–4 well ceased production of oil in 1968. Well B–5 produced oil until 1964. It also produced gas in paying quantities from October 1958 through December 1971. B–5 was recompleted in October 1972 as a gas well and has produced gas in paying quantities since that date. B–6 produced oil in paying quantities until 1968.

Appellants executed a release of all oil rights in the twenty acres around well B–5 in February of 1966.

On December 31, 1969, C. Kinnear Earl, as Trustee of the J. A. Halamicek Trust, as lessor, executed two oil, gas and mineral leases to appellee Tartan Resources Corporation, one of which covered the oil rights down to 7,500 feet in the 20-acre tracts on which the B–1, B–4 and B–6 wells are located, and the gas rights down to and in-

cluding the Greta Sand in the two 160-acre tracts on which the B–2 and B–3 wells are located; and other rights not involved in this litigation.

Appellants contend that the production of oil from well B–1 is sufficient to keep the 1945 lease, as amended, alive as to the gas rights in the two 160-acre tracts discussed above and as to the oil rights in the three 20-acre tracts discussed above; and that the habendum clause of the 1945 lease provides that production from any tract will hold the lease as to all other tracts.

On the other hand, appellees contend that paragraph 6 of the 1945 lease, as amended in 1954, clearly amends the habendum clause. The effect of said amendment is that the mineral rights under each tract of land must be held by production of the reserved mineral on each respective tract. Appellees argue that the gas rights to the two 160-acre tracts and the oil rights to two of the 20-acre tracts (B–4 and B–6) terminated when the production of gas and oil, respectively, ceased on those tracts. We agree.

Appellants and appellees agree that the 1945 lease, as amended, is not ambiguous, but they disagree about its application.

The trial court concluded that the habendum clause had been modified so that oil rights were retained only by continuous production of oil as to each well theretofore completed as an oil well and gas rights were retained only by continuous production of gas as to each well theretofore completed as a gas well. The court further concluded that the lease terminated as to each well as production ceased therefrom. Finally, the trial court concluded that the lease remained effective as to the 20-acre tract around well B–1 because such well has continuously produced oil in paying quantities.

In their appeal, appellants raise nine points of error. We will discuss points 1–6 together.

Points 1–6 complain of the trial court's ruling that the habendum clause of the 1945 lease was modified by the 1954 amendment to paragraph 6 to the extent that the mineral rights in the respective tracts in question would terminate as to each tract when the production of the reserved mineral thereunder ceased. This complaint assails the trial court's finding of fact # 15 and conclusions of law # 2, # 3, # 4 and # 5. As appellants state in their brief, "the effect of the 1954 amendment upon the 1945 lease is the crux of this case." The material portions of the amendment to paragraph 6 are as follows:

". . . the following shall be substituted as and shall be paragraph 6 of said lease and binding on the parties hereto:

'6. If more than ninety (90) consecutive days shall elapse between the completion of a well on said land, either as a producer or as a dry hole, and the commencement of operations for the drilling of another well on said land, this lease shall terminate at the end of such ninety (90) day period as to all of said land except:

(a) The oil and oil rights (including the rights in casinghead gas produced with oil) in 20 acres, as nearly in the form of a square as practicable, around each well theretofore completed as an oil well; and

(b) The gas and gas rights (including the rights in distillate and condensate) in 160 acres, as nearly in the form of a square as practicable, around each well theretofore completed as a gas well, down to and including the sand from which such well produced gas."

As we have noted, the lease provides for a primary term of one year and then states that it will remain in effect "as long thereafter as oil, gas, or other minerals are being produced from said land." So absent paragraph 6, the lease would remain in effect so long as well B–1 produced oil in paying quantities. Mathews v. Sun Oil

Company, 425 S.W.2d 330 (Tex.Sup.1968); Orive v. Sun Oil Company, 346 S.W.2d 383 (Tex.Civ.App.—San Antonio 1961, writ ref'd).

Clearly, paragraph 6 amends the habendum clause. Paragraph 6 plainly declares that production in paying quantities will not, in and of itself, hold the entire leased premises. Appellants must comply with the continuous drilling program established in paragraph 6. Upon appellants' failure to do so, the lease terminates by its own terms as to the entire leased premises except "the oil and oil rights . . . in 20 acres, . . . around each well theretofore completed as an oil well; and the gas and gas rights . . . in 160 acres, . . ., around each well theretofore completed as a gas well, down to and including the sand from which such well produced gas." The conflict between the parties centers around the issues of whether the oil wells and gas wells referred to in paragraph 6 must have been producing oil or gas at the time that the continuous drilling operations required by the new paragraph 6 ceased and whether or not production on each tract must continue in order to keep the lease in effect as to the oil or gas rights reserved under the respective 20-acre and 160-acre tracts.

We hold that paragraph 6, when read in conjunction with the habendum clause (paragraph 2) requires that gas be produced from each 160-acre tract in paying quantities and that oil must be produced from each 20-acre tract in paying quantities in order that the lease remain in effect as to each tract.

At the outset, it must be noted that the instrument distinguishes between gas wells and oil wells. Further, the parties did not intend that a well "theretofore completed" as a dry hole would hold any acreage upon the cessation of the continuous drilling program. We fail to see how a well which produces neither oil nor gas can be "a well theretofore completed" as an "oil well" or "gas well". As noted in Struss v. Stoddard, 258 S.W.2d 413 (Tex.Civ.App.—Fort Worth 1953, writ ref'd n. r. e.):

"When speaking of completed or abandoned locations where drilling operations occurred in a search, the general intent and leading purpose of which was to produce oil or gas, oil-field terminology denotes such as 'oil wells,' 'gas wells' and 'dry holes.' A 'dry hole' will therefore never be considered a well of any kind or character with respect to a contract for the drilling of a 'well' for oil or gas, unless by express wording of the contract, or by necessary implication from the general intent and leading purpose to be accomplished thereby, it must be so considered. . . . Likewise, the term 'well' will never be considered to be and designate a 'dry hole' unless it must be so considered after application of the same tests. . . ."

Also, see Vernon's Tex.Rev.Civ.Stat.Ann. Art. 6008 §§ 2(d), 2(e) (1962). There is no express provision that a dry hole will hold acreage either as an "oil well" or "gas well". The purpose of the 1945 lease is production of oil, gas, or other minerals. The instrument appears to be particularly designed to compel the lessee to produce oil, gas or other minerals. The lease contains no delay rental provision which might allow the lessee to delay drilling operations, nor does it contain a shut-in royalty clause which would allow a lessee to find oil or gas in paying quantities and then cap the well without obtaining production. The lease requires continuous drilling, if the lease is to remain in force as to the undeveloped portion of the leased premises. These facts do not demonstrate an intent of the parties that a dry hole be contemplated in the terms "gas well" or "oil well".

In addition, the provision in paragraph 6 that only gas rights are retained by gas production and that only oil rights are retained by oil production further demonstrates that it was the intent of the parties that each of said minerals be fully exploit-

ed and that the habendum clause (paragraph 2) be modified to the extent that gas production will hold only gas rights and oil production will hold only oil rights. See Hunt Oil Company v. Dishman, 352 S.W. 2d 760 (Tex.Civ.App.—Beaumont 1961, writ ref'd n. r. e.).

In light of the provisions of this lease discussed above, it is evident that the well must be producing oil, or gas, at the date that lessee ceases permanent drilling operations required in paragraph 6, as amended, and the mineral (oil or gas) produced as of that date determines the acreage and mineral rights therein which said well will hold under the lease.

It is also clear that oil or gas production will hold only oil or gas rights limited in area: 20 acres around each oil well and 160 acres around each gas well. Paragraph 2 (habendum clause) operates independently upon each tract. Under this lease oil production will not hold gas rights, nor will gas production hold oil rights as to this lease. Production of one mineral allows the lessee, under this lease, to retain only the right to produce that mineral within a limited acreage surrounding that well. It is apparent that the habendum clause, when read in conjunction with paragraph 6, applies to each individual tract. Production of gas on one 160-acre tract will not maintain the lease as to gas rights in another 160-acre tract, because the right to production of gas is limited to a designated 160-acre tract around each gas well.

Well B–1 has continuously produced oil in paying quantities. Therefore the 1945 lease, as amended, is still in effect as to the oil rights in the 20-acre tract on which B–1 is located.

Wells B–4 and B–6 have ceased to produce oil; the 1945 lease, as amended, has terminated as to the 20-acre tracts held by B–4 and B–6 respectively. Well B–3 ceased to produce gas; the lease has terminated as to the 160-acre tract on which B–3 is located.

Well B–2 ceased producing gas in 1966. In 1958, however, Well B–5 (which is located on the 160-acre tract held by B–2) began producing gas. B–5 continuously produced gas from 1958 through December 1971 and ceased production from January 1972 through September 1972. Thus, the lease has terminated as to the 160-acre tract around Well B–2. Appellants' points 1–6 are overruled.

This brings us to a consideration of points 7 and 8 wherein the appellants complain of fact finding # 15. In this finding, the trial court said that it was the intention of the parties to the 1947 and 1954 amendments to amend the habendum clause of the 1945 lease so that thereafter oil and oil rights were held by oil production only and gas and gas rights were held by gas production only.

Although the trial court did not expressly conclude that the 1945 lease, as amended, was unambiguous, neither party complains of such failure. Indeed, both parties agree that the instrument is unambiguous and we hold that it is not ambiguous. We further conclude that, despite its designation, finding of fact # 15 is a conclusion of law. Shirey v. Albright, 404 S.W.2d 152 (Tex.Civ.App.—Corpus Christi 1966, writ ref'd n. r. e.).

Because the instrument in question is, as a matter of law, unambiguous and finding # 15 is a conclusion of *law*, appellants' points 7 and 8 which allege that finding of *fact* # 15 is not supported by any evidence and that such finding is contrary to the great weight and preponderance of the evidence cannot be sustained. Even so, if we consider the lease as ambiguous, the trial court's finding of fact # 15 is supported by the release executed by appellants' predecessors in title in October of 1954 and by the release by appellants in 1966 of all oil rights in the twenty acre tract on which B–5 is located. These documents are some evidence that the parties to the lease intended to amend the habendum clause of the 1945 lease so that oil rights were held

by oil production only and gas rights were held by gas production only. Thus, for these additional reasons appellants' point 7 must be overruled. In Re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1951).

■ As for point 8, when we view the evidence both favorable to and contrary to the trial court's finding we find the only contrary evidence to be: 1) the self serving testimony of appellant Nafco's employee, Mr. Havard that the appellant Nafco had always treated the B–1, B–2, B–3, B–4, B–5 and B–6 tracts as "one lease"; 2) a memo prepared by Mr. Havard that "Only the B–1 well is still in production and holding the Halamicek Lease". Therefore, the trial court's finding is not so contrary to the great weight and preponderance of the evidence as to be clearly wrong and unjust. O'Neill v. Craig, 493 S.W.2d 898 (Tex.Civ.App.—Corpus Christi 1973, writ ref'd n. r. e.); In Re King's Estate, supra. Appellants' points 7 and 8 are overruled.

By their ninth point, appellants allege that the trial court's finding (14d) that appellant Nafco's failure to attempt to restore gas production to the B–5 well from January 1, 1972, through October 1972 was unreasonable and that Nafco did not act as a reasonably prudent operator is contrary to the great weight and preponderance of the evidence.

■ Although we feel that such a finding is supported by sufficient evidence, the issue of whether or not Nafco conducted itself as a "reasonably prudent operator" is not involved in this case, because there was a total and voluntary cessation of production. Wainwright v. Wainwright, 359 S.W.2d 628 (Tex.Civ.App.—Fort Worth 1962, writ ref'd n. r. e.). The issue of the reasonableness of Nafco's conduct is material only insofar as it shows that the cessation of production from Well B–5 was not "temporary" in the sense that it would permit Nafco to hold the 160-acre B–2 gas well tract, on which B–5 is located, by re-

newal of gas production from B–5 after an eight month cessation of production. Normally where production in paying quantities ceases after the end of the primary terms, the lease automatically terminates. Watson v. Rochmill, 137 Tex. 565, 155 S. W.2d 783 (1941). The application of this rule has been modified, however, where there has been temporary cessation of production due to a sudden stoppage of the well or some mechanical breakdown of the equipment or other similar circumstances. Watson v. Rochmill, supra; Scarborough v. New Domain Oil & Gas Co., 276 S.W. 331 (Tex.Civ.App.—El Paso 1925, writ dism'd). The evidence establishes that no production was obtained from the B–5 well in the month of October 1971 and no production for the months of February through October of 1972. The reason for this cessation of production was the depletion of the 4200 foot Miocene sand. The cessation of production was not brought about by any mechanical failure, nor was it sudden or unexpected. Some reworking did take place between October 1971 and December 1971. But this did not achieve continuous production. No further work was done from January 1972 through September 1972. Subsequently, in October 1972, the well was recompleted as an associated gas well in the Magnet Withers gas cap. The existence, however, of the Magnet Withers gas cap was known to appellants in January of 1972. The recompletion work done in October of 1972 could have been easily done in January 1972. The decision to let the well sit without production was simply based on economics.

■ We feel that this evidence clearly shows that the cessation of production for a period of approximately eight months was not such a "temporary cessation" as would allow appellants to keep the lease in effect by renewed production in October of 1972 from Well B–5. See Watson v. Rochmill, supra. After considering the entire record, we hold that the finding of fact # 14d is not so against the great weight and preponderance of the evidence

as to be clearly unjust. Appellants' ninth point is overruled.

The judgment of the trial court is affirmed.