

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| CHESAPEAKE EXPLORATION, L.L.C., CHESAPEAKE OPERATING, INC., ANADARKO PETROLEUM CORPORATION, and SWEPI, L.P., | § § § | |
| Appellants, | § | No. 08-13-00266-CV |
| v. | § | Appeal from the |
| | § | |
| ENERGEN RESOURCES CORPORATION, KAISER FRANCIS OIL COMPANY, PRIDE ENERGY COMPANY, CROWN OIL PARTNERS, IV, L.P., CRUMP ENERGY PARTNERS, L.L.C., DALTON H. COBB, JR., MICHAEL B. COBB, BILL HIGHTTOWER, and HIGHTOWER EXPLORATION, L.L.C., | § § § § | 143rd Judicial District Court of Ward County, Texas (TC# 12-01-22742-CVW) |
| | § | |
| Appellees. | § | |

## **O P I N I O N**

This case involves the construction of two oil and gas leases executed in 1976 (hereinafter, "the 1976 leases") and their effect on a 640-acre section of land covered by the leases—Section 25. Section 25 was pooled with an adjacent section of land not covered by the 1976 leases—Section 18—to form two pooled gas units. One of the pooled units continues to produce to this day, but the other ceased producing completely in 1988 when its well was plugged and abandoned. That particular well was completed in March 1979, and its operator designated all of Section 25 as the

well's proration unit in paperwork filed with the Texas Railroad Commission (hereinafter, "RRC"). Approximately two months thereafter, continuous development ended on the leased premises. The leases provide that when continuous development ends, the lease terminates as to all acreage except for:

> [E]ach proration unit established under . . . [the] rules and regulations [of the RRC . . .] upon which there exists (either on the above described land or on lands pooled or unitized therewith) a well capable of producing oil and/or gas in commercial quantities . . . .

The issue is whether, under the above-quoted "retained acreage" clause, the 1976 leases remain in effect as to all of Section 25, as urged by Plaintiffs-Appellees[1] (hereinafter "Energen"), or only as to an 80-acre portion of Section 25, as urged by Defendants-Appellants[2] (hereinafter, "Chesapeake"). On cross-motions for summary judgment, the trial court ruled in favor of Energen and against Chesapeake. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The 1976 leases cover acreage located in Ward County, Texas, including the aforementioned Section 25 of Block 1, W&NW Ry. Co. Survey. Each lease contains a "pooling" clause, which states in pertinent part:

> 5. Lessee is hereby granted the right to pool or unitize this lease, the land covered by it or any part thereof with any other land, lease, leases, mineral estates or parts thereof for the production of oil, gas, or any other minerals. . . . Drilling operations and production on any part of the pooled acreage shall be treated as if such drilling operations were upon or such production was from the land described in this lease whether the well or wells be located on the land covered by this lease or

---

[1] Appellees are Energen Resources Corporation, Kaiser Francis Oil Company, Pride Energy Company, Crown Oil Partners, IV, L.P., Crump Energy Partners, L.L.C., Dalton H. Cobb, Jr., Michael B. Cobb, Bill Hightower, and Hightower Exploration, L.L.C. We refer to Appellees collectively as Energen, for we see nothing that requires us to distinguish among them.

[2] Appellants are Chesapeake Exploration, L.L.C., Chesapeake Operating, Inc., Anadarko Petroleum Corp., and SWEPI, L.P. We refer to Appellants collectively as Chesapeake because, again, we see nothing that requires us to distinguish among them.

2

not.  The entire acreage pooled into a unit shall be treated for all purposes … as if it were included in this lease.

Pursuant to this provision, an 80-acre portion of Section 25 was pooled with a 560-acre portion of Section 18 to form a 640-acre pooled gas unit named the Cadenhead No. 1 Pooled Gas Unit.  This pooled unit's well, the Cadenhead No. 1 Well, was drilled and completed on the 560-acre portion of Section 18 in 1978, and it has continually produced gas in commercial quantities since then.  The next year, the Cadenhead No. 2 Well was completed on Section 25.  This well was included in a 640-acre pooled gas unit named the Cadenhead No. 2 Pooled Gas Unit, which consisted of 560 acres from Section 25 and 80 acres from Section 18.  As mentioned earlier, the designated proration unit for the Cadenhead No. 2 Well included all of Section 25.  Each lease also contains a provision requiring termination if the leased premises are not continuously developed as set forth in the leases' "continuous development" clauses.  Those clauses provide in relevant part:

> [12]D.    Lessee shall continuously develop the above described land by commencing operations for the drilling of a well on or before the expiration of the primary term of this lease and thereafter shall allow not more than sixty (60) days to elapse between the completion or abandonment of one well and the commencement of the next until the above described land is drilled to the density necessary to obtain the maximum allowable per well under the rules and regulations of the Railroad Commission of Texas (or other governmental authority having jurisdiction), or this lease shall terminate as to all of the above described land . . . .

As indicated earlier, after the Cadenhead No. 2 Well was completed in March 1979, no additional wells were drilled on the leased premises.  The Cadenhead No. 2 well was subsequently plugged back and recompleted in a shallower field in 1984.  Four years later, it was abandoned.

Through subsequent transactions not relevant to this appeal, Energen and Chesapeake acquired their respective interests in Section 25.  In 2011, Energen drilled a well on the 560-acre

3

portion of Section 25 that had been pooled with the 80-acre portion of Section 18 and obtained a permit to drill another well. Chesapeake too obtained a permit to drill a well on the 560-acre portion of Section 25. Each party requested that the other cease operations. Neither did, and the present action ensued.

In the trial court, both parties agreed with the principle that production anywhere on the pooled premises is sufficient to maintain the entire lease unless the lease provides otherwise. They disagreed, however, on whether the retained acreage clause in each lease provided otherwise. Chesapeake argued the retained acreage clause provided otherwise because it applied "equally to 'all' of the lands under lease, even if pooling has occurred and even as to pooled lands." According to Chesapeake, the clause expressly provides for continuous and automatic termination, *i.e.*, "rolling" termination, of proration units as they cease to produce. Thus, when the proration unit for the Cadenhead No. 2 Well ceased to exist in 1988, the 1976 leases terminated as to the 560-acre portion of Section 25 on which that well had been drilled, irrespective of continued production from the Cadenhead No. 1 Pooled Gas Unit.

Energen urged a different construction. According to Energen, the retained acreage clause did not provide for "rolling" termination because the clause operated once and only once—when continuous development ceased. Under Energen's interpretation, all acreage included in a designated proration unit was retained if a well capable of producing in commercial quantities existed on the leased premises or on acreage pooled with the leased premises when continuous development ended. Thus, "[b]ecause the Cadenhead No. 2 Well was then capable of producing in commercial quantities, the lease was preserved as to its designated proration unit, all of Section 25, a portion of which had previously been pooled with Section 18."

4

In essence, both parties agreed the retained acreage applied, but disagreed on its scope and temporal application.

## THE RETAINED ACREAGE CLAUSE DOE NOT PROVIDE FOR "ROLLING" TERMINATION

In one issue, Chesapeake argues the trial court erred in concluding the 1976 leases did not require "rolling" termination of non-producing proration units "to maintain the lease[s] in effect throughout the secondary term—not just at the moment that continuous development ends." In so arguing, Chesapeake takes the position that the proration unit designated for the Cadenhead No. 2 Well was retained only while the well was producing, and when it ceased to produce in 1988, the proration unit reverted to the lessors and was no longer subject to the 1976 leases. We disagree.

### *Standard of Review*

The trial court's summary judgment concerns the construction of an unambiguous oil and gas lease.[3] The standard of review is therefore *de novo*. *See Tex. Mun. Power Agency v. Pub. Util. Comm'n of Tex.*, 253 S.W.3d 184, 192 (Tex. 2007)(reviewing grant of summary judgment *de novo*); *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002)(reviewing lease-construction questions *de novo*).

### *Applicable Law*

The primary duty of the court in interpreting an oil and gas lease is to ascertain the parties' intent as expressed within the four corners of the lease. *Luckel v. White*, 819 S.W.2d 459, 461 (Tex. 1991). In seeking to ascertain the parties' intent, the court must attempt to harmonize all parts of the lease, even if different parts of the lease appear contradictory or inconsistent. *Id.* at 461-62. Construing the lease to give effect to all of its provisions honors the parties' intent that

---

[3] The parties agree the lease is not ambiguous, and we do not hold otherwise. The parties also agree the resolution of this appeal hinges on the law, not on disputed facts.

every clause has some effect and in some measure evidences their agreement. *Luckel*, 819 S.W.2d at 462. Accordingly, the court should not strike down any part of the lease, unless there is an irreconcilable conflict wherein one part of the lease destroys in effect another part thereof. *Id*.

### *Discussion*

When read in harmony with other portions of the leases, the retained acreage clauses do not provide for "rolling" termination of non-producing proration units as argued by Chesapeake. Instead, the language of the 1976 leases confirms that production anywhere on Section 25, or land pooled with it, is sufficient to maintain the leases as to the entirety of Section 25.

The habendum clauses in both leases provide for continuation beyond the primary term "as long . . . as oil, gas, or other mineral is produced from said land or land with which said land is pooled." Under Texas law, a habendum clause referring to "said land" extends the lease as to all the leased property while production of oil or gas occurs anywhere on the property during the second term. *Ridge Oil Co., Inc. v. Guinn Invs., Inc.*, 148 S.W.3d 143, 149 (Tex. 2004). Thus, "in the absence of anything in the lease to indicate a contrary intent, production on one tract will operate to perpetuate the lease as to all tracts described therein and covered thereby." *Matthews v. Sun Oil Co.*, 425 S.W.2d 330, 333 (Tex. 1968).

Concordant with this general principle, the lease's pooling clauses provide that: "Drilling operations and production on any part of the pooled acreage shall be treated as if such drilling operations were upon or such production was from the land described in this lease whether the well or wells be located on the land covered by this lease or not." Accorded its plain, grammatical meaning, this clause ensures that production anywhere on a pooled unit maintains the lease in effect as to all lands covered by the lease, both within and outside the unit, unless the lease

6

expressly provides otherwise. *Key Operating & Equip., Inc. v. Hegar*, 435 S.W.3d 794, 798 (Tex. 2014); *Scott v. Pure Oil Co.*, 194 F.2d 393, 395 (5th Cir. 1952); *Texaco, Inc. v. Lettermann*, 343 S.W.2d 726, 733 (Tex.Civ.App.--Amarillo 1961, writ ref'd n.r.e.).

As indicated earlier, Chesapeake and Energen disagree on whether operations conducted within the pooled gas units serve to maintain the 1976 leases as to the entirety of Section 25. However, they agree the answer to their dispute lies in the proper interpretation of the retained acreage clauses, which control the termination of the leases after cessation of continuous development. "Retained acreage clauses were originally drafted to prevent the lessee from losing those portions of a lease that had productive wells located thereon if the rest of the lease terminated . . . [but] . . . [t]he term has expanded its meaning to include clauses that require the release of all acreage that, at the end of the primary term, is not within a drilling, spacing, or proration unit." Bruce M. Kramer, *Oil and Gas Leases and Pooling: A Look Back and A Peek Ahead*, 45 TEX. TECH L.REV. 877, 881 n.28 (2013).

Here, the leases' retained acreage clauses, in conjunction with the continuous development clauses, provide that the lessee's failure to continuously develop the leased premises terminates the leases as to all unproductive acreage except for:

> [E]ach proration unit established under . . . [the] rules and regulations [of the RRC . . .] upon which there exists (either on the above described land or on lands pooled or unitized therewith) a well capable of producing oil and/or gas in commercial quantities . . . .

When a lease terminates "is always a question of resolving the intention of the parties from the entire instrument." *Thompson*, 94 S.W.3d at 554. "However, we will not hold the lease's language to impose a special limitation on the grant unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning." *Thompson*, 94 S.W.3d at 554.

7

The plain, grammatical language of the retained acreage clause does not expressly provide for rolling termination of proration units as they cease to exist. Instead, the plain, grammatical language shows that the parties intended the leases to continue as to each designated proration unit if the unit had a well capable of producing gas in commercial quantities when continuous development ceased. That the parties chose to maintain the lease as to each proration unit when continuous drilling stopped based on the ability of that unit's well to produce gas, rather than actual production, indicates they did not intend the retained acreage clause to be triggered any time actual production stops. To conclude otherwise would promote uncertainty about the continued existence of a lease. Moreover, adopting the construction urged by Chesapeake imposes an unnecessary limitation on the kind and character of the estate the parties chose to convey, *i.e.*, an expansive one maintained by production from any part of pooled lands unless limited by language so clear, precise, and unequivocal that no other conclusion could be reached. That type of language is absent from the retained acreage clauses.

Chesapeake contends that the retained acreage clauses must be read to modify the habendum clauses to require "rolling" termination of non-producing proration units, as designated by the Texas Railroad Commission, such that production from a pooled unit will not maintain the leases as to proration units that ceased to exist. It makes two arguments in support of this construction, one of which finds no support in the leases, and the other of which finds no support in Texas case law.

Chesapeake first argues that "[t]he parties' use of a specific regulatory term —[RRC-designated] proration unit—to define the extent to which the 1976 leases would be maintained after continuous development" signals their intent "that the leases would only be

8

maintained as to lands within proration units for so long as such proration units existed." Chesapeake thus asserts that because "[p]roration units are designed on a well-by-well basis and only exist for so long as the well for which the proration unit is designated produces[,]" the proration unit for the Cadenhead Well No. 2 ceased to exist when it was plugged.

But this construction is belied by the plain, express language of the retained acreage clauses. The language in these clauses makes clear that: (1) proration units, as recognized by the state agency having regulatory jurisdiction over oil and gas development, are the portions of the leased premises maintained after continuous development ceases; and (2) each proration unit is maintained, not by the existence on the unit of a producing well, but by the existence on the unit of a well capable of producing in paying quantities. The use of the specific regulatory term in the retained acreage clause merely serves to identify with reasonable certainty the property that remains under lease when continuous development ceases. In other words, the term "RRC-designated proration unit" functions as a mere descriptor in the clause, not as a normative one in the sense that it prescribes what ought to be the outcome based on the application of RRC regulations. If the parties to the 1976 leases had wished to provide for continual relinquishment of non-producing proration units, so that a proration unit would no longer be subject to the lease once production had ceased on that particular unit, they could have done so by including such language. But they did not, and it is not within our purview to rewrite the leases and alter the parties' contract. *See Am. Mfrs. Mut. Ins. Co. v. Schaefer*, 124 S.W.3d 154, 162 (Tex. 2003) ("But we may neither rewrite the parties' contract nor add to its language.").

Chesapeake also argues that the parties to the 1976 leases could not have intended for production on a single unit to maintain the entire lease indefinitely after continuous development

9

ceased. Although this argument has some equitable appeal, it is refuted by language of the lease, as demonstrated above. Moreover, maintaining the leases during the secondary term to acreage outside of producing proration units but within a pooled unit would not be novel. "The primary legal consequence of pooling is that 'production and operations anywhere on the pooled unit are treated as if they have taken place on each tract within the unit.'" *Hegar*, 435 S.W.3d at 798. Additionally, production from the pooled gas unit provides the lessors with an economic benefit in the form of royalty income. Granted, the lessors could have achieved an additional economic benefit by expressly stating that production on each proration unit is required to maintain the leases as to each of those units during the secondary term. However, they failed to do so. Absent proof of fraud or mutual mistake, neither of which was pled by the parties, we are not at liberty to rewrite the economic bargain struck by the parties to the 1976 leases. *See Eagle Life Ins. Co. v. G.I.C. Ins. Co.*, 697 S.W.2d 648, 651 (Tex.App.--San Antonio 1985, writ ref'd n.r.e.)("Courts are not at liberty to rewrite the contract between the parties without pleading and proof of fraud or mutual mistake."). Accordingly, we decline Chesapeake's invitation to construe the retained acreage clauses—decades after the fact—as expressly stating "that the leases would only be maintained as to lands within proration units for so long as such proration units existed" in the absence of clear, precise, and unequivocal language to that effect. *See Lettermann*, 343 S.W.2d at 732 ("[I]n the absence of clear language to the contrary, pooling clauses should not be construed in a narrow or limited sense.").

Chesapeake next argues that "Texas case law directly on point confirms that the 1976 leases terminated as to the disputed acreage." In support of this argument, Chesapeake relies chiefly on *Nafco Oil & Gas, Inc. v. Tartan Res. Corp.*, 522 S.W.2d 703 (Tex.Civ.App.--Corpus

10

Christi 1975, writ ref'd n.r.e). According to Chesapeake, *Nafco* stands for the proposition that "even where a retained acreage provision is silent as to whether a lease terminates as to a retained tract once the retained tract's well stops producing later in the life of the lease, the fee simple determinable nature of an oil and gas leases requires courts to imply such an intent . . . ." But Chesapeake's reliance on *Nafco* is misplaced. Although *Nafco* is distinguishable, the court's opinion in that case actually supports our conclusion. In *Nafco*, the court held that the habendum clause, as modified by the retained acreage clause, operated independently upon each tract and that production on one 160-acre tract would not maintain the lease as to another 160-acre tract on which production had ceased. 522 S.W.2d at 707-08. The retained acreage clause there provided that upon the lessee's failure to comply with the continuous drilling program, the lease terminated as to the entire premises except as to "the gas and gas rights . . . in 160 acres . . . around each well theretofore completed as a gas well, down to and including the sand from which such well produced gas." *Id*. at 705. When continuous drilling ceased in 1954, four wells were producing oil. *Id.* at 705. The two oil wells at issue ceased producing in 1968. *Id.* Relying on the habendum clause, the appellants argued that continued production from an oil well was sufficient to maintain the lease as to the oil wells even though those wells were not located on the same 160-acre tract of land on which the producing well was located. *Id*. at 705-06. The court disagreed, concluding that, "[i]n light of the provisions of this lease discussed above, *it is evident that the well must be producing oil, or gas*, *at the date that lessee ceases permanent drilling operations* required in paragraph 6, as amended, and the mineral (oil or gas) produced as of that date determines the acreage and mineral rights therein which said well will hold under the lease." *Id.* at 708 [Emphasis added].

11

*Nafco* is distinguishable in that there is no indication the lease in that case contained a pooling clause. *Nafco* is also distinguishable because the retained acreage clause there expressly required actual production on each 160-acre tract when continuous development ceased. But significantly, the *Nafco* court did not construe the retained acreage clause there to mean it operated continuously over the life of the lease. Rather, as the italicized language quoted above demonstrates, the *Nafco* court construed that clause to mean it operate once and only once—"at the date that lessee ceases permanent drilling operations . . . ." That interpretation comports with ours.

Like *Nafco*, the court's opinion in *Humphrey v. Seale*, 716 S.W.2d 620 (Tex.App.--Corpus Christi 1986, no writ), supports our conclusion. In *Seale*, the court held that, in the absence of language in the retained acreage clause calling for a continual relinquishment on non-producing lease acreage, the general rule provides that production anywhere on the leased premises maintains the lease. 716 S.W.2d at 622. The retained acreage clause there provided that upon the lessee's failure to comply with the continuous drilling program, the lease terminated as to the entire premises except as to "forty (40) acres designated as a well block around such producing well, and said well block designation shall be filed of record immediately after said block has been designated by Lessee . . . ." *Id*. at 621. When appellant acquired his interest in the leased premises in April 1982, two of the wells in dispute were no longer producing, but the other disputed well continued to produce until appellant ceased operations on it when he filed suit. *Id*. The appellees took "the position that 40 acres was retained around the well only while a well produced, and upon the cessation of production of a particular well, the 40 acres surrounding that well reverted to the landowner and was no longer subject to the . . . [l]ease." *Seale*, 716 S.W.2d at

12

The court disagreed, concluding:

> [The retained acreage clause] *does not require the lessee to relinquish additional acreage from the lease after the initial release is accomplished 'within 180 days of the first oil well.'* As all three of the 40-acre tracts are under the same lease and lease terms, production on one will keep the lease in effect for all.

*Seale*, 716 S.W.2d at 622 [Emphasis added].

The retained acreage clause in *Seale*, like the one in *Nafco*, is not identical to the ones here. However, that difference is immaterial because the *Seale* court, like the *Nafco* court, did not construe the retained acreage clause there to mean it operated continuously over the life of the lease. Rather, as the italicized language quoted above demonstrates, the *Seale* court construed that clause to mean it operates once and only once—when the initial release of acreage occurred after continuous drilling ceased.

Chesapeake argues *Seale* does not support our conclusion because termination of the lease under the retained acreage clause there "was not automatic but rather required an affirmative action by the lessee," and thus, it was not surprising that "the [c]ourt declined to imply a continuing release obligation that would effectuate 'rolling' lease termination." But that was not the reason why the *Seale* court declined to construe the retained acreage clause in that case to mean it operated continuously over the life of the lease. Rather, the court declined to construe the clause in that manner because the clause did not provide for rolling termination in clear, precise, and unequivocal language. As the court was quick to note, "[i]f the parties to the lease had wished to provide for a continual relinquishment of nonproducing acreage, so that a 40-acre tract would no longer be subject to the lease once production had ceased on that particular 40-acre tract, it would have been simple to include such language." *Seale*, 716 S.W.2d 622.

For the foregoing reasons, Chesapeake has not shown the trial court erred in concluding

13

that the 1976 leases failed to provide for rolling termination of non-producing proration units.

**CONCLUSION**

The trial court's order granting Energen's motion for summary judgment is affirmed.


October 1, 2014

YVONNE T. RODRIGUEZ, Justice

Before McClure, C.J., Rivera, and Rodriguez, JJ.
Rivera, J. (Not Participating)