ANN CRAWFORD McCLURE, Chief Justice
In the world of oil and gas, it is no great secret that mineral owners generally prefer to have their minerals gathered and sold. The lease bonus paid at the outset of a mineral lease is nice, but a stream of royalty payments is better. On the other hand, mineral lessees must measure the cost to gather and bring the minerals to market against the expected return. They must prioritize where best to invest the substantial costs of hiring a drilling rig. At the intersection of these sometimes competing interests are three clauses in a typical oil and gas lease: (1) the habendum clause that sets a termination date for the lease unless the lessee is producing minerals from the leasehold; (2) the continuous development clause which similarly requires production or at least drilling activity; and (3) the retained acreage clause that defines what portion of the entire leasehold is protected from termination when the lessee develops some, but not all the land encompassed by the lease.[1]
Today we are asked to construe a lease containing variants of these clauses. The dispute arises out of a 640-acre leasehold that contains four equal proration units of 160 acres.[2] At the end of the lease's primary term, at least one well was producing on each of those four proration units. All *652 agree that the primary term of the lease was extended. With the passage of time, however, the wells on three of the 160 acre units stopped producing, and no new wells were developed on those units. In that context, does the one operating well on only one of 160 acre units extend the lease in favor of the lessee for the entire 640 acres, or only for the one proration unit that has an operating well? We conclude the entire leasehold is extended and we reverse the trial court's judgment to the contrary.
FACTUAL AND PROCEDURAL BACKGROUND
On July 11, 1975, the predecessors of Apache Deepwater, LLC (Apache) leased from Gladys Clark the mineral rights to Section 43, Block Y, Abstract 360 of the M. K.&T. RR Co. survey in Reagan County. The lease provided for a primary term of three years. During that primary term, Apache's predecessors drilled and brought into production four wells.[3] Consistent with the regulatory scheme at the time, Apache's predecessor divided the 640 acre section into four 160 acre proration units; each of those units had one of the operating wells within its boundaries. At the end of the primary term of the lease in July 1978, all four wells were producing.
Under the habendum clause to the lease, the primary term of the lease was extended "as long thereafter as oil, gas or other hydrocarbons or other minerals or leased substances, or either or any of them, are produced from the leased premises...." In the ensuing years, the wells on three of the four proration units ceased to produce. The wells in the southeast, northeast, and northwest proration units stopped producing in 1999, 2004, and 2008 respectively.[4] The Gladys Clark No. A-3 well located in the southwest proration unit operated until July 31, 2010. Before it stopped producing, however, well No. A-5TM was completed in that same proration unit and according to our record is still operating.
Apache or its predecessors did not develop any new wells in the southeast, northeast, and northwest proration units of Section 43. In 2012, the property owner executed mineral leases in favor of Double Eagle Development LLC (Double Eagle) or its predecessors for the portion of Section 43 comprising those three proration units, and those leases have been extended through at least 2018. We refer to these three 160 acre proration units as the Disputed Tracts. This litigation arose after Double Eagle demanded that Apache release its interest to the Disputed Tracts. Apache, however, contended that it still owned the rights to the Disputed Tracts by virtue of its continued production from the well in the southwest proration unit of Section of 43. Double Eagle filed suit seeking a declaration of its rights in the Disputed Tracts. Apache answered and both sides filed competing motions for summary judgment. Both sides agree to the factual history as to when the respective wells were brought into and taken out of production. Both sides agree that the decision here turns on the construction of the original lease that Apache's predecessors signed with the property owner in 1975, *653 and neither side believes the lease to be ambiguous.
The parties focus on several provisions in the lease. First, the lease uses the defined term "leased premises" to include all 640 acres of Section 43. The lease then incorporates the term "leased premises" in several other provisions, including the habendum clause which reads:
TO HAVE AND TO HOLD the leased premises for a term of three (3) years from the date hereof, hereinafter called 'primary term,' and as long thereafter as oil, gas or other hydrocarbons or other minerals or leased substances, or either or any of them, are produced from the leased premises or from lands with which the leased premises are pooled or unitized.
The lease itself appears to be a pre-printed form, but it contains several typewritten special provisions that the parties added. One of those includes the three-year term which was typed in after the original term on the pre-printed from was struck out. The stated purpose of the lease includes "drilling, producing and operating wells or mines" on the leased premises. Consistent with that goal, the lease contains a delay rental clause, such that if the lessee had not begun drilling operations within the first year of the lease, additional delay rental payments were due. The lease also contained a "drilling operations" clause which in part provides:
If, at the expiration of the primary term, oil, gas or other minerals are not being produced from the leased premises ... but Lessee is then engaged in operations for drilling or reworking of any well, this lease shall remain in force so long as such drilling or reworking operations are prosecuted, or reworking operations on any well or additional drilling operations are conducted on the leased premises, ... with no cessation of more than sixty (60) consecutive days, and if any such operations result in production then as long thereafter as such production continues.
One of the typewritten inserted provisions reflects an intent to develop the minerals on the property:
11(a) This lease contemplates the reasonable development of the above designated minerals, including the drilling, or mining, or production as the facts may justify. Lessee shall adequately protect the mineral under the above described lands, or acreage pooled therewith, from drainage from the adjacent lands or leases.
The "retained acreage clause" which is central to this case, was also typewritten. The parties agree that its terms are unique at least in the sense that no reported case directly interprets its text:
17. Notwithstanding anything to the contrary in the foregoing, Lessee covenants to release this lease after the primary term except as to each producing well on said lease, operations for which were commenced prior to or at the end of the primary term and the proration units as may be allocated to said wells under the rules and regulations of the Railroad Commission of Texas or 160 acres, whichever is greater, insofar as said proration units cover from surface to the base of the deepest formation penetrated by the deepest of said wells. The description of said tracts around said well shall be compiled and prepared by the Lessee for purpose of executing such release.
Apache contended below that the retained acreage clause involves a single snapshot-in-time evaluation as of July 11, 1978 (the end of the primary term) and because each of the four proration units had operating wells on that date, the termination obligation under the clause does *654 not apply. Conversely, Double Eagle contends the clause unambiguously calls for "rolling terminations" following the primary term for any proration unit in which the lessee allows the operating well to go out of production, and no new well is developed. The trial court ruled in favor of Double Eagle, granting its summary judgment, and denying Apache's motion.[5]
STANDARD OF REVIEW
Each party contends that the lease at issue is not ambiguous and that its legal construction favors its position. We review the trial court's construction of an unambiguous oil and gas lease de novo. Anadarko Petroleum Corp. v. Thompson , 94 S.W.3d 550, 554 (Tex. 2002) ; Chesapeake Expl., L.L.C. v. Energen Res. Corp. , 445 S.W.3d 878, 881 (Tex.App.-El Paso 2014, no pet.). When conducting a de novo review, we apply our own judgment and accord no deference to the trial court's decision. Quick v. City of Austin , 7 S.W.3d 109, 116 (Tex. 1998).
Our primary duty is to ascertain the parties' intent as expressed within the four corners of the lease. Luckel v. White , 819 S.W.2d 459, 461 (Tex. 1991). We give the lease's language its plain, grammatical meaning unless doing so would clearly defeat the parties' intentions. Fox v. Thoreson , 398 S.W.2d 88, 92 (Tex. 1966). We also attempt to harmonize all parts of the lease, even if different parts of the lease appear contradictory or inconsistent. Luckel , 819 S.W.2d at 461-62. Doing so honors the parties' intent that every clause has some effect and in some measure evidences their agreement. Luckel , 819 S.W.2d at 462. Accordingly, a court should not strike down any part of the lease unless there is an irreconcilable conflict such that one part of the lease destroys another part. Id. ; Chesapeake Expl. , 445 S.W.3d at 882.
When both parties move for summary judgment on the same issue and the trial court grants one motion and denies the other, we determine if the trial court erred in doing so, and either affirm or render the judgment that the trial court should have rendered. Valence Operating Co. v. Dorsett , 164 S.W.3d 656, 661 (Tex. 2005).
WAS THERE A CLEAR INTENT TO NEGATE THE HABENDUM CLAUSE?
We begin our construction of the lease with the habendum clause. That clause permits a single operating well (producing *655 in paying quantities) anywhere on the leasehold to continue the entire 640 acres past the primary term. It extends the lease "as long thereafter as oil, gas or other hydrocarbons or other minerals or leased substances, or either or any of them, are produced from the leased premises. " [Emphasis added]. The term leased premises is defined to encompass the entire 640 acre section. This habendum clause is consistent with other such clauses that set a relatively brief period of time for minerals to be located on the property ("primary term"), and then allows the lease to continue so long thereafter as oil, gas, or other minerals are produced. Thompson , 94 S.W.3d at 554.[6] Ordinarily, production of oil and gas from any part of leased acreage is sufficient to hold the entirety of the leased property. See Mathews v. Sun Oil Co. , 425 S.W.2d 330, 333 (Tex. 1968) ; Mayo Found. for Medical Education v. Courson Oil & Gas, Inc. , 505 S.W.3d 68, 70 (Tex.App.-Amarillo 2016, pet. denied) ; Chesapeake Expl. , 445 S.W.3d at 882.
This feature of the habendum clause is consistent with the "drilling operations" clause which also contemplates that a single well might prevent termination of the lease. It provides that if there are no minerals being produced at the end of the primary term, but "Lessee is then engaged in operations for drilling or reworking of any well , this lease shall remain in force so long as such drilling or reworking operations are prosecuted, or reworking operations on any well or additional drilling operations are conducted on the leased premises , ... with no cessation of more than sixty (60) consecutive days, ...." [Emphasis added]. If that additional drilling results in production, then the lease remains in effect "as long thereafter as such production continues." This language contemplates a single well preserving the entire leased premises, which fits hand in glove with well ATM-5 extending the entire lease.
Double Eagle does not argue otherwise, but rather claims that the retained acreage clause, which begins with the clause "notwithstanding anything to the contrary", negates and modifies the clear wording of the habendum and drilling operations clauses. Reduced to its essence, the question before us is whether a retained acreage clause which requires the lessee "to release this lease after the primary term except as to each [proration unit with a producing well commenced before or at the end of the primary term]" intends either that:
1. The lessee will release any proration unit which has neither an operating well, nor well in development as of the date when the primary term ends ; or
2. The lessee will release any proration unit that has neither an operating well, nor well in development at any time after the end of the primary term.
Our answer to that quandary begins with a review of our recent decision in Chesapeake Exploration., L.L.C. v. Energen Resources Corp. , 445 S.W.3d 878 (Tex.App.-El Paso 2014, no pet.). Apache contends Chesapeake is dispositive of the outcome here. As in this case, the lessee in Chesapeake was attempting to hold onto an entire leasehold, comprised of a section of land, based on a single operating well. Id. at 881. The section had been prorated into two parts, with each part then pooled with tracts on an adjoining section.
*656 Id. at 879. The leases provided for a continuous development period which set timetables for drilling and developing wells. Id. at 880. When that development period ended, there was a producing well on each of the two pooled tracts sufficient to keep the leases in force. But later, one of those wells was plugged leaving one portion of the leased section without an operating well. Under the language of the habendum and pooling clauses, the single producing well single was sufficient to extend the lease for the entire section. Id. at 881. The question was whether a continuous operations clause, that contained retained acreage language, overcame the clear directive in the habendum and pooling clauses.[7]
We held that it did not, and that the lease remained in effect as to all 640 acres because the plain language of the retained acreage clause did not provide for the "rolling" termination of proration units. Id. "The plain, grammatical language of the retained acreage clause does not expressly provide for rolling termination of proration units as they cease to exist." Id. at 883. In the absence of such clear language, we held the retained acreage clause operated once and only once-at the end of continuous development. Id. at 885-886, citing Humphrey v. Seale , 716 S.W.2d 620, 621-22 (Tex.App.-Corpus Christi 1986, no writ) and Nafco Oil & Gas, Inc. v. Tartan Res. Corp. , 522 S.W.2d 703, 708 (Tex.Civ.App.-Corpus Christi 1975, writ ref'd n.r.e.). We reasoned that if the parties had wanted to provide for continual relinquishment of nonproducing proration units they could have done so by including specific language to that effect. "But they did not, and it is not within our purview to rewrite the leases and alter the parties' contract." 445 S.W.3d at 884. In the absence of clear, precise, and unequivocal language that leaves room for no other conclusion, we refused to impose an "unnecessary limitation on the kind and character of the estate the parties chose to convey...." Id. at 883.
Applying the same logic here, we conclude that the retained acreage clause does not express a clear intent to negate the habendum clause. Instead, it can be read to mean that at the end of the primary term, the lessor could insist that any part of the leasehold that was not within a proration unit which had either a producing well, or a well under development that later came into production, must be released. This reading harmonizes the retained acreage clause with the habendum clause and the drilling operations clause, giving effect to each. Double Eagle correctly points out that the clause uses the phrase "after the primary term" and not "at the expiration of the primary term" as is used elsewhere in the lease. But the retained acreage clause ties the release "after the primary term" to all land except those with a producing well, "operations for which were commenced prior to or at *657 the end of the primary term." Thus the lessor would not know if a well was producing exactly at the end of the three-year term if that well was commenced "at the end of the primary term." The clause would therefore have to allow for termination "after the primary term" if such a well was started close to or on the last day of the primary term and never panned out.
Draftsmen understand how to create rolling termination clauses in oil and gas leases. See Parten v. Cannon , 829 S.W.2d 327, 329 (Tex.App.-Waco 1992, writ denied) (rolling terminations created with lease language stating that production or operations would "maintain this lease in effect only with regard" to proration unit with producing wells or wells under development and the lease "shall terminate as to such part or parts of the leased land lying outside"); Hunt Oil Co. v. Dishman , 352 S.W.2d 760, 761 (Tex.Civ.App.-Beaumont 1961, writ ref'd n.r.e.) (language that Lessor "at any time" could notify lessee of non-compliance of development obligation, and allowing lessee to retain only that acreage around operating wells). The lease language here falls short of that kind of clear, precise, and unequivocal language which would cause us to effectively re-write the habendum clause. See also Humphrey , 716 S.W.2d at 622 ("If the parties to the lease had wished to provide for a continual relinquishment of nonproducing acreage, so that a 40-acre tract would no longer be subject to the lease once production had ceased on that particular 40-acre tract, it would have been simple to include such language. However, in the absence of such a provision, the general rule that production anywhere on the leased premises will maintain the lease prevails.").
Double Eagle argues that Chesapeake is distinguishable on several grounds. First, it contends that the precise lease language differs from that here. We agree the lease terms are not on all fours, and we also agree that each lease must be construed on its own terms. But Double Eagle cannot escape that it must find language that clearly negates the habendum clause, and we simply fail to find that kind of clear unequivocal language in the retained acreage clause. Double Eagle also contends that the lease in Chesapeake involved a date certain trigger for the retained acreage clause-the date at which the lessee obtained the maximum well density allowed by the regulatory authorities. Chesapeake , 445 S.W.3d at 880. But we fail to see how this trigger date is any more or less certain than the end of the primary term of the lease which Apache contends is the relevant trigger date here. Double Eagle also points out that the lease language in Chesapeake focused on wells that were capable of producing, as distinct from wells that were actually producing. Id. at 883. We agree such lease language made Chesapeake a much easier case, because the vagaries of which wells were capable of producing lent a level of "uncertainty about the continued existence of a lease" which we sought to avoid. Id. at 883. Whether a well is producing (in paying quantities) might be a more straightforward issue, though even that inquiry is not always black and white. See Clifton v. Koontz , 160 Tex. 82, 325 S.W.2d 684, 689-91 (1959) (discussing accounting factors in determining whether well is producing in paying quantities). Nevertheless, that factor does not dissuade us from applying Chesapeake 's underlying logic.[8]
*658 We are also unpersuaded by Double Eagle's additional arguments. It contends that the phrase "after the primary term" is synonymous with "secondary term" in industry terminology. Thus the first portion of the retained acreage clause actually reads something like, "lessee covenants to release during the secondary term" for any non-productive units. If the parties had intended "after the primary term" to really mean "during the secondary term" they could have said so, as they chose to define "leased premises." They did not, and we will not re-define a word's ordinary meaning absent some indication that the parties meant otherwise.
Double Eagle also suggests its construction can be harmonized with every clause in the lease. That harmonizing mostly consists of using the "notwithstanding anything to the contrary" clause from the retained acreage to negate parts of the habendum and drilling operations clauses. Or it means to carve the leased premises into separate leaseholds where the habendum clause operates separately as to each proration unit as the court did in Nafco Oil & Gas, Inc. v. Tartan Res. Corp. , 522 S.W.2d 703, 708 (Tex.Civ.App.-Corpus Christi 1975, writ ref'd n.r.e.). But this construction would also require us to redefine the term "leased premises" to mean something less than the 640 acres as it is expressly defined as in the lease.
Double Eagle pitches this construction as being consistent with the lease's stated goal of encouraging production (the lease was granted "for the purpose of exploring by geological, geophysical and all other methods, and of drilling, producing and operating wells or mines"). While this and most other mineral leases share the same stated or unstated purpose, that goal cannot override express language in the lease. As in Chesapeake , Double Eagle's concern that Apache can tie up the entire section with a single well with modest production has some equitable appeal. But the concept that a single producing well can dictate the term for an entire leasehold is not novel. Chesapeake Expl. , 445 S.W.3d at 884. Nor are the owners of the property without recourse. Another typed provision of the lease requires "reasonable development of the above designated minerals, including the drilling, or mining, or production as the facts may justify." This express provision echoes the implied duty of development in every mineral lease. Clifton , 325 S.W.2d at 693-94. If Apache is truly failing to pursue the true potential of this property, the owners could sue for breach of that clause or the implied duty. See Exxon Corp. v. Emerald Oil & Gas Co., L.C. , 348 S.W.3d 194, 216 (Tex. 2011) (resolving appeal from such a claim, but concluding the evidence in that case did not show a breach of the particular contract clause at issue). The term "production" under the habendum clause also means production in paying quantities. Thompson , 94 S.W.3d at 554. The mineral owners could likewise complain if production fell below that threshold. Additionally, Paragraph 17 contained a horizontal Pugh clause, such that the mineral interests below 10,004 feet had already been released back to the owners, and they were free to develop minerals at lower depths. See Sandefer Oil & Gas, Inc. v. Duhon , 961 F.2d 1207, 1209-10 (5th Cir. 1992) (noting purpose of horizontal Pugh clause is to promote development at all depths).
Finally, Double Eagle places greater emphasis on the retained acreage clause because it is typewritten, while other provisions are on a pre-printed form. See *659 McCreary v. Bay Area Bank & Trust , 68 S.W.3d 727, 732 (Tex.App.-Houston [14th Dist.] 2001, pet. denied) (noting preference for typewritten provisions over pre-printed forms in contract construction). But we note that the habendum clause itself has a typewritten change made to it. The original parties must have specifically considered, and then modified that clause. We can accord it no less dignity than other typewritten provisions.
CONCLUSION
We sustain Apache's two issues which urge that the trial court erred in its construction of the lease. We grant judgment in Apache's favor in one regard, but deny it in another. Apache's motion for summary judgment sought a declaration that the express language of the 1975 Lease provides for the determination of retained acreage on a date certain, July 11, 1978 and as of that date, Apache retained the acreage in each quarter section by virtue of the then operating wells. It also sought a declaration that it "holds record title and ownership to the entire mineral leasehold interest, thus, Double Eagle's claims for partial termination of the 1975 Lease fail as a matter of law." We sustain that relief, but only to the depth of 10,004 feet because as Double Eagle alleged in its petition, and Apache has not challenged otherwise, that a predecessor in interest to Apache has already released the entire section below 10,004 feet.
Hughes, J., not participating

See Bruce M. Kramer, Oil and Gas Leases and Pooling: A Look Back and A Peek Ahead , 45 Tex.Tech L.Rev. 877, 880, 892 (2013) (generally describing the operation of these clauses).

Absent an express contractual agreement providing otherwise, a proration unit is defined for regulatory purposes as "the acreage assigned to a well for the purpose of assigning allowables and allocating allowable production to the well." 16 Tex.Admin.Code § 3.38(a)(3) (West 2013); see Operating, LLC v. Chesapeake Expl. LP , 480 S.W.3d 22, 27-28 (Tex.App.-Amarillo 2015, pet. denied).

Gladys Clark No 1 located on the NW/4 was completed on January 3, 1977; Gladys Clark No. A-1, located on the NE/4 was completed on October 16, 1977; Gladys Clark No. A-2 located on SE/4 was completed on October 25, 1977 and Gladys Clark No A-3, located on the SW/4 was completed on October 27, 1977.

Gladys Clark, No. A-2 well produced until December 14, 1999. The Gladys Clark No. A-1 well has not produced since April 26, 2004. The Gladys Clark No. 1 well, has not produced since August 1, 2008.

We pause to note that the final order being appealed from does nothing more than grant and deny the respective parties' motions. It does not actually order anything or grant any specific relief. A final order or judgment should, however, specifically deny or grant the relief sought, as opposed to merely granting or denying a motion. Here, the parties would have to go back to Double Eagle's motion to ascertain what relief was sought. Even then, the prayer from the granted motion asks that the court:
[F]ind as a matter of law that the 1975 Lease has terminated as to the Expired Tracts, and order the 1975 Lease removed from the record as to the Expired Tracts, thereby quieting title in Double Eagle.
A third party researching the mineral interests would have to look further into the motion to see how the term "Expired Tracts" is defined. One might also wonder from what "record" Double Eagle asks the lease to be removed. Additionally, the parties dispute not only the acreage that may have been released, but also the depth at which the mineral lease terminates. A predecessor of Apache released any mineral claims below 10,004 feet which Double Eagle claims it has leased irrespective of the outcome of this appeal. Apache does not directly address this contention, but it is not expressly part of the relief requested in Double Eagle's motion. A final judgment that set out specifically the declaration being granted would have easily resolved these concerns.

The term "producing" in a habendum clause such as this requires actual production in paying quantities. See, e.g., Thompson , 94 S.W.3d at 554. Double Eagle complains that the single remaining well is only producing about two barrels a day, but no claim was made below that that level of production is less than a paying quantity.

The relevant language from continuous operations clause in Chesapeake read:
Lessee shall continuously develop the above described land by commencing operations for the drilling of a well on or before the expiration of the primary term of this lease and thereafter shall allow not more than sixty (60) days to elapse between the completion or abandonment of one well and the commencement of the next until the above described land is drilled to the density necessary to obtain the maximum allowable per well under the rules and regulations of the Railroad Commission of Texas (or other governmental authority having jurisdiction), or this lease shall terminate as to all of the above described land.... [E]ach proration unit established under [the] rules and regulations [of the RRC ...] upon which there exists (either on the above described land or on lands pooled or unitized therewith) a well capable of producing oil and/or gas in commercial quantities....
445 S.W.3d at 880, 883.

Double Eagle also notes that the lease in Chesapeake included a pooling clause with language that also avoided termination of the lease so long as one well tied to the leased section was in production. Pooling is not a consideration here, but the habendum clause is clear enough on its own, and as we note above, is also buttressed by the drilling operations clause.