Opinion filed October 23, 2014



In The

# Eleventh Court of Appeals

———————

## No. 11-12-00322-CV

———————

**ENDEAVOR ENERGY RESOURCES, L.P. AND ENDEAVOR PETROLEUM, LLC, Appellants**

**V.**

**DISCOVERY OPERATING, INC.; PATRIOT ROYALTY AND LAND, LLC; STANLEY D. ELROD; KAREN M. THOMAS; JON DAVID ELROD; JANICE K. GAITHER; JOSEPH ELROD; AND REBECCA J. WILLIAMS, NORVELLA ANN SCHAFER, AND JACKIE LUE WELLS, TRUSTEES OF THE MILDRED HAGGARD IRREVOCABLE GRANTOR TRUST, Appellees**

**On Appeal from the 118th District Court**

**Martin County, Texas**

**Trial Court Cause No. 6439**

## O P I N I O N

Discovery Operating, Inc. (Discovery) and Patriot Royalty and Land, LLC (Patriot) brought a trespass to try title action against Endeavor Energy Resources, L.P. and Endeavor Petroleum, LLC (collectively Endeavor). Claiming under various oil and gas leases, the parties asserted competing claims of title to, and

ownership of, determinable fee interests in the minerals in the following lands: (1) NW/4 Section 9, Block 35, T-1-N, T&P Ry. Co. Survey, Martin County, Texas; and (2) SW/4 Section 4, Block 35, T-1-N, T&P Ry. Co. Survey, Martin County, Texas. Discovery and Patriot contended that Endeavor, as an oil and gas lessee, had held leasehold interests in all of Section 4 and the N/2 of Section 9 by virtue of four oil and gas leases but that the leases partially terminated as to the NW/4 of Section 9 and the SW/4 of Section 4. After the alleged partial termination, Patriot, as lessee, leased the mineral interests in the disputed quarter sections and then assigned the leases to Discovery. Endeavor contended that its leases remained in full force and effect as to the disputed quarter sections.

Stanley D. Elrod, Karen M. Thomas, Jon David Elrod, Janice K. Gaither, and Joseph Elrod (the Elrod Intervenors) and Rebecca J. Williams, Norvella Ann Schafer, and Jackie Lue Wells, Trustees of the Mildred Haggard Irrevocable Grantor Trust (the Haggard Trust Intervenors) intervened in the suit. The Elrod Intervenors and the Haggard Trust Intervenors are the oil and gas lessors of the mineral interests in the disputed quarter sections. All of the Intervenors aligned themselves with Discovery and Patriot.

The parties stipulated that the competing claims of ownership of the mineral estates in the disputed quarter sections emanated from a common source of title. *See Rogers v. Ricane Enters., Inc.*, 884 S.W.2d 763, 768 (Tex. 1994) (a claimant in a trespass to try title action may recover by proving superior title out of a common source). The parties filed competing traditional motions for summary judgment. The trial court entered an order in which it granted Discovery and Patriot's motion, the Elrod Intervenors' motion, and the Haggard Trust Intervenors' motion, and denied Endeavor's motion. In its order, the trial court awarded Discovery and Patriot exclusive title to, and possession of, the oil and gas leasehold estates in the disputed quarter sections. Endeavor appeals the trial court's order. We affirm.

2

The record shows that Endeavor acquired mineral leasehold interests in the N/2 of Section 9 and all of Section 4 under four oil and gas leases (the Endeavor Leases). The Endeavor Leases were dated March 24, 2004, July 15, 2004, July 16, 2007, and July 16, 2007. The March 24, 2004 lease was from Mildred Haggard, as lessor, to Jimmy Henson, as lessee. This lease covered the N/2 of Section 9, which consisted of about 320 acres of land, and it was for a primary term of three years. Henson assigned an interest in the lease to Endeavor. The July 15, 2004 lease was from Janice K. Gaither, as lessor, to Jimmy Henson, as lessee. This lease covered all of Section 4, which consisted of about 640 acres of land, and it was for a primary term of three years.[1] Henson assigned an interest in the lease to Endeavor. One of the July 16, 2007 leases was from Joseph Elrod, as lessor, to Endeavor, as lessee. This lease covered the South Half (S2) of Section 4, and it was for a primary term of six months. The other July 16, 2007 lease was from David Elrod, as lessor, to Bryan Gossett, as lessee. This lease covered the S/2 of Section 4, and it was for a primary term of six months. Gossett assigned an interest in the lease to Endeavor. At the time the Endeavor Leases were executed, the Intervenors or their predecessors in interest owned a combined 100% of the surface and mineral estates in the disputed quarter sections that are involved in this appeal (NW/4 of Section 9 and SW/4 of Section 4).

Each of the Endeavor Leases contained a continuous development clause that provided as follows:

> 17. At the expiration of the Primary Term hereof, this lease shall automatically terminate as to each proration unit upon which there is no well or wells thereon located and then producing oil or gas in commercial quantities unless Lessee is then engaged in drilling or reworking operations in accordance with the other provisions hereto. In the event Lessee is engaged in drilling or reworking operations at

---

[1]The acreage in the North Half of Section 4 is not in dispute in this case.

the expiration of the Primary Term, this lease shall remain in full force and effect as to all proration units so long as a continuous drilling program is maintained whereby not more than one-hundred twenty (120) days shall elapse from the completion of one well to the commencement of another well until all proration units are tested.

The Endeavor Leases also each contained the following automatic termination clause:

18. At the end of the Primary Term or upon the cessation of the continuous development of the Leased premises required above, whichever is later, this lease shall automatically terminate as to all lands and depths covered herein, save and except those lands and depths located within a governmental proration unit assigned to a well producing oil or gas in paying quantities and the depths down to and including one hundred feet (100') below the deepest productive perforation(s), with each such governmental proration unit to contain the number of acres required to comply with the applicable rules and regulations of the Railroad Commission of Texas for obtaining the maximum producing allowable for the particular well.

The summary judgment evidence showed that Endeavor, as the operator, drilled and completed two producing wells—the Haggard "9" #1 Well and the Haggard "9" #2 Well—on the North Half of Section 9 and two producing wells—the Elrod "4A" #3 Well and the Elrod "4A" #4 Well—on the South Half of Section 4. The Haggard wells were both located in the NE/4 of Section 9; the Elrod wells were both located in the SE/4 of Section 4. Endeavor did not drill any wells in the disputed quarter sections (NW/4 of Section 9 and SW/4 of Section 4). The parties stipulated that Endeavor's Haggard "9" #1 Well, Haggard "9" #2 Well, Elrod "4A" #3 Well, and Elrod "4A" #4 Well had at all times continuously produced oil in paying quantities. We will sometimes refer to these four wells collectively as the "Endeavor Wells."

The Endeavor Wells are producing oil from the Spraberry (Trend Area) Field. The parties agree that production from this field is governed by special field

4

rules that have been promulgated by the Texas Railroad Commission (RRC). A portion of the agreed summary judgment evidence contains a December 16, 2008 RRC "Final Order Amending Field Rule Nos. 2 and 3 in the Spraberry (Trend Area) Field Various Counties, Texas." Rule 2 relates to spacing requirements for wells. Rule 3 relates to acreage assigned to wells. Rule 3 provides in relevant part as follows:

> The acreage assigned to an individual well shall be known as a proration unit. The standard drilling and proration units are established hereby to be EIGHTY (80) acres. No proration unit shall consist of more than EIGHTY (80) acres except as hereinafter provided. The two farthermost points in any proration unit shall not be in excess of THREE THOUSAND (3,000) feet removed from each other; provided however, that in the case of long and narrow leases or in cases where because of the shape of the lease such is necessary to permit the utilization of tolerance acreage, the Commission may after proper showing grant exceptions to the limitations as to the shape of proration units as herein contained. All proration units shall consist of continuous and contiguous acreage which can reasonably be considered to be productive of oil. No double assignment of acreage will be accepted.

> Notwithstanding the above, operators may elect to assign a tolerance of not more than EIGHTY (80) acres of additional unassigned lease acreage to a well on an EIGHTY (80) acre unit and shall in such event receive allowable credit for not more than ONE HUNDRED SIXTY (160) acres.

> Operators shall file with the Commission certified plats of their properties in said field, which plats shall set out distinctly all of those things pertinent to the determination of the acreage credit claimed for each well.

After Endeavor completed the Haggard "9" #1 Well in the N/2 of Section 9, Endeavor filed a certified proration plat with the RRC. In the plat, Endeavor assigned 160.42 acres to the Haggard "9" #1 Well. After completing the Haggard

"9" #2 Well, Endeavor filed another certified proration plat with the RRC that related to the N/2 of Section 9. This plat was filed on October 26, 2007. In the plat, Endeavor assigned 81.21 acres in the North Half of the Northeast Fourth (N/2 NE/4) of Section 9 to its Haggard "9" #1 Well, and Endeavor assigned 81.21 acres in the South Half of the Northeast Fourth (S/2 NE/4) of Section 9 to its Haggard "9" #2 Well. Endeavor did not assign any portion of the acreage in the disputed quarter section (NW/4 of Section 9) to either of the Haggard Wells.

After Endeavor completed the Elrod "4A" #3 Well, Endeavor filed a certified proration plat with the RRC. In the plat, Endeavor assigned 162 acres to the Elrod "4A" #3 Well. After completing the Elrod "4A" #4 Well, Endeavor filed another certified proration plat with the RRC that related to the S/2 of Section 4. This plat was filed on December 16, 2008. In the plat, Endeavor assigned 81 acres in the North Half of the Southeast Fourth (N/2 SE/4) of Section 4 to the Elrod "4A" #3 Well, and Endeavor assigned 81 acres in the South Half of the Southeast Fourth (S/2 SE/4) of Section 4 to the Elrod "4A" #4 Well. Endeavor did not assign any portion of the acreage in the disputed quarter section (SW/4 of Section 4) to either of the Elrod Wells.

As stated above, Section 17 of the Endeavor Leases contained continuous development clauses. Endeavor does not dispute that the continuous development period as to the N/2 of Section 9 expired on or about February 9, 2008, which was 120 days after Endeavor completed the Haggard "9" #2 Well. Endeavor also does not dispute that the continuous development period as to the S/2 of Section 4 expired on or about February 5, 2009, which was 120 days after Endeavor completed the Elrod "4A" #4 Well.

After a review of the Endeavor leases that were on file with the county clerk and after a review of the plats that Endeavor filed with the RRC, Patriot believed that the Endeavor leases had automatically terminated as to the disputed acreage.

Patriot based its opinion on the lease terms and on the fact that the acreage was outside the assigned proration units that Endeavor had designated with, and were on file with, the RRC. Patriot obtained oil and gas leases from Intervenors on the disputed quarter sections. Later, Patriot assigned the leases to Discovery. We will refer to these leases as the "Discovery Leases." Discovery drilled two producing wells in each of the disputed quarter sections. The parties stipulated that Discovery's wells had at all times continuously produced oil in paying quantities.

Endeavor asserted that, under the terms of the Endeavor Leases, each of its producing wells held 160 acres under lease. Endeavor contended that its two Haggard wells were sufficient to hold the entirety of the 320 acres in the N/2 of Section 9 under lease and that its two Elrod wells were sufficient to hold the entirety of the 320 acres in the S/2 of Section 4 under lease. Based on these contentions, Endeavor asserted that the Endeavor Leases had not terminated as to the acreage in the disputed quarter sections and that, therefore, the Discovery Leases were not valid. Endeavor claimed that it had included incorrect amounts of acreage in the proration units in its October 26, 2007 and December 16, 2008 certified proration plats by mistake. Endeavor sought RRC approval of different plats in which Endeavor attempted to change the acreage in the proration units to 160 acres for each of the four wells.

Discovery and Patriot filed suit as a result of their dispute with Endeavor as to the title and ownership of the mineral interests in the disputed quarter sections. The RRC informed Endeavor that the RRC could not act on Endeavor's requests for 160-acre proration units in light of the title dispute and pending litigation between Endeavor and Discovery.

In the trial court, the parties moved for summary judgment on their competing claims of title to the leasehold estates. The trial court granted summary judgment in favor of Discovery, Patriot, and the Intervenors. The trial court denied

Endeavor's motion for summary judgment. In its summary judgment order, the trial court ordered that the Endeavor Leases terminated as to the disputed quarter sections; that the Discovery Leases of the disputed quarter sections were valid; and that Discovery and Patriot held record title to, ownership of, and the exclusive right to possession of the mineral leasehold interests in the disputed quarter sections.

In a single appellate issue, Endeavor contends that the trial court erred when it denied Endeavor's motion for summary judgment and when it granted Discovery and Patriot's motion for summary judgment, the Elrod Intervenors' motion for summary judgment, and the Haggard Trust Intervenors' motion for summary judgment. We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim*, 315 S.W.3d 860, 862 (Tex. 2010). The movant for traditional summary judgment must show that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). When, as here, competing motions for summary judgment are filed and one is granted and the other denied, the reviewing court must review the summary judgment evidence presented by both sides, determine all questions presented, and render such judgment as the trial court should have rendered. *Comm'rs Court of Titus Cnty. v. Agan*, 940 S.W.2d 77, 81 (Tex. 1997).

The parties agree that Endeavor, as an oil and gas lessee, acquired a fee simple determinable interest in the mineral estates in the leased lands. In a typical oil and gas lease, the lessor is a grantor and grants a fee simple determinable interest to the lessee, who is actually a grantee. *See Natural Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 192 (Tex. 2003). The lessee acquires ownership of all the minerals in place that the lessor owns and purports to lease, subject to the possibility of reverter in the lessor. *Id.* The lessee's interest is "determinable"

8

because it may terminate and revert entirely to the lessor upon the occurrence of events that the lease specifies will cause termination of the estate. *Id.*

The resolution of this appeal depends upon an interpretation and construction of Section 18 of the Endeavor Leases. We have quoted Section 18 above. All of the parties to this appeal assert that Section 18 is unambiguous. As explained below, we conclude that the language used in Section 18 can be assigned a certain or definite legal meaning or interpretation and that, therefore, Section 18 is unambiguous. *See Columbia Gas Transmission Corp. v. New Ulm Gas, Ltd.*, 940 S.W.2d 587, 589 (Tex. 1996) (a contract is not ambiguous if it can be given a definite or certain legal meaning as a matter of law).

An oil and gas lease is a contract, and its terms are interpreted as such. *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 860 (Tex. 2005). The interpretation of an unambiguous lease is a question of law for the court, subject to de novo review. *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550, 554 (Tex. 2002). In construing an unambiguous lease, our primary duty is to ascertain the parties' intent as expressed within the lease's four corners. *Id.* We do not look for the subjective intent of the parties, which may be conflicting; instead, it is the objective intent as expressed in the lease that controls our construction of an unambiguous lease. *Cherokee Water Co. v. Forderhause*, 641 S.W.2d 522, 525 (Tex. 1982). In our analysis, we give the language as set out in the lease its plain, grammatical meaning unless doing so would clearly defeat the parties' intentions. *Anadarko*, 94 S.W.3d at 554. We examine the entire lease and attempt to harmonize all its parts, even if different parts appear contradictory or inconsistent, and we presume that the parties to a lease intended every clause to have some effect. *Id.* Thus, we attempt to give effect to all the provisions of the lease so that no provision will be rendered meaningless. *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

Section 18 is triggered "[a]t the end of the Primary Term or upon the cessation of the continuous development of the Leased premises required above, whichever is later." Section 18 provides that, on the later of these two dates, the lease will automatically terminate as to all of the leased lands, save and except for "those lands and depths located within a governmental proration unit assigned to a well . . . , with each such governmental proration unit to contain the number of acres required to comply with the applicable rules and regulations of the [RRC] for obtaining the maximum producing allowable for the particular well."

Endeavor contends that, under the plain language of Section 18, the parties to the Endeavor Leases agreed that each producing well would maintain the leases as to the number of acres specified by the RRC in its special field rules for obtaining the maximum producing allowable for the well. Endeavor asserts that, because the RRC special field rules allow a proration unit to contain 160 acres to obtain the maximum producing allowable in a well in the Spraberry (Trend Area) Field, each of its four producing wells held 160 acres under lease. Thus, Endeavor argues that its Haggard wells were sufficient to hold the entire 320 leased acres in the N/2 of Section 9 under lease and that its Elrod wells were sufficient to hold the entire 320 leased acres in the S/2 of Section 4 under lease.

Discovery and the other Appellees contend that Section 18 required Endeavor to assign acreage to a governmental proration unit in a certified proration plat filed with the RRC in order to maintain the acreage under lease. Based on this contention, Appellees assert that the Endeavor Leases automatically terminated as to the lands in the disputed quarter sections because, on the date that the continuous development periods ended, the lands in the disputed quarter sections were not located in a governmental proration unit assigned by Endeavor to a well.

Appellees assert that the Endeavor Leases granted Endeavor a determinable fee estate that was subject to a special limitation in Section 18. A special

10

limitation or condition in a lease provides that the lease automatically terminates upon the happening of stipulated events. *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 79 (Tex. 1989); *Hitzelberger v. Samedan Oil Corp.*, 948 S.W.2d 497, 506 (Tex. App.—Waco 1997, pet. denied). A breach of a special limitation or condition results in automatic termination of the leasehold estate. *Rogers*, 772 S.W.2d at 79; *Hitzelberger*, 948 S.W.2d at 506. Section 18 provides that, on the later date of two dates, the leases would terminate as to all lands "save and except those lands and depths located within a governmental proration unit assigned to a well." This language constitutes a special limitation on the lessors' grants of the mineral estates. *See Parten v. Cannon*, 829 S.W.2d 327, 329–30 (Tex. App.—Waco 1992, writ denied) (lease language that provided for termination at the end of the primary term "as to such part or parts of the leased land lying outside the allotted area" constituted a special limitation on the grant); *Mayfield v. Benavides*, 693 S.W.2d 500, 503 (Tex. App.—San Antonio 1985, writ ref'd n.r.e.) (lease language that provided for termination at the expiration of the primary term as to all land "except as to the land allocated to a well or wells for production purposes" constituted a special limitation on the grant).

Rule 3 of the applicable RRC field rules governs assignments of acreage to proration units. Rule 3 provides that "[t]he acreage assigned to an individual well shall be known as a proration unit." The RRC defines the term "proration unit" in its statewide rules as "[t]he acreage assigned to a well for the purpose of assigning allowables and allocating allowable production to the well." 16 TEX. ADMIN. CODE § 3.38(a)(3) (Tex. R.R. Comm'n, Well Densities). The RRC defines "tolerance acreage" in its statewide rules as "[a]creage within a lease, pooled unit, or unitized tract that may be assigned to a well for proration purposes pursuant to special field rules in addition to the amount established for a prescribed or optional proration unit." *Id.* § 3.38(a)(6).

Rule 3 of the field rules also provides that a standard proration unit is eighty acres. Under the rule, "operators may elect to assign a tolerance of not more than EIGHTY (80) acres of additional unassigned lease acreage to a well on an EIGHTY (80) acre unit and shall in such event receive allowable credit for not more than ONE HUNDRED SIXTY (160) acres." Thus, if an operator does not elect to assign tolerance acreage, the size of the proration unit is eighty acres. Rule 3 requires operators to file certified plats with the RRC that show "all of those things pertinent to the determination of the acreage credit claimed for each well."

Under the special field rules for the Spraberry (Trend Area) Field, the allowable production for a particular well is based in part on the amount of acreage, including tolerance acreage, assigned to the well. *See* Tex. R.R. Comm'n, *In the Spraberry (Trend Area) Field Various Counties, Texas*, Oil and Gas Docket No. 7C-0274561, Rule 4 (June 12, 2012) (final order amending and renumbering field rules). The more acreage assigned to the well, the higher the allowable production assigned to the well. *Id.* A proration unit assigned to a well by an operator must contain the maximum amount of acreage permitted under Rule 3 for the well to be assigned the maximum allowable production. Rule 3 provides that a standard proration unit consists of eighty acres and that additional tolerance of not more than eighty acres may be assigned to a well by an operator. Accordingly, the maximum amount of acreage that an operator can include in a proration unit assigned to a well is 160 acres. This amount of acreage is necessary for a well to obtain a maximum producing allowable.

The plain language of Section 18 provides that, on the later date of the end of the primary term or continuous development, the leases would terminate as to all lands, save and except "those lands and depths located within a governmental proration unit assigned to a well." The parties' use of the word "assigned" is significant. Under Rule 3 of the special field rules, the only way to "assign" a

12

governmental proration unit to a well is for an operator to file a certified proration plat with the RRC. In fact, Rule 3 requires operators to file certified plats that show acreage assigned to wells in the field. Therefore, we conclude that the parties intended for the Endeavor Leases to terminate as to acreage that was not included in a governmental proration unit assigned to a well by Endeavor in a certified proration plat filed with the RRC.

Endeavor argues that interpreting Section 18 to require it to assign acreage in a certified proration plat ignores and renders of no effect the last clause in Section 18: "with each such governmental proration unit to contain the number of acres required to comply with the applicable rules and regulations of the [RRC] for obtaining the maximum producing allowable for the particular well." Endeavor argues that this clause automatically establishes the size of the proration units to be 160 acres and that, therefore, Endeavor was not required to file a proration plat or to take any other action to maintain its leased acreage.

We disagree with Endeavor's argument. The last clause in Section 18 must be interpreted in light of the remainder of Section 18. Endeavor's interpretation conflicts with the parties' use of the word "assigned" in the earlier clause. Considering Section 18 in its entirety, we conclude that the parties intended the last clause in Section 18 to define the amount of acres that Endeavor was to include in the governmental proration units that it assigned in its certified proration plats filed with the RRC. The last clause did not relieve Endeavor of its obligation to assign acreage to a well in a certified proration plat to maintain the acreage under lease. This interpretation of the last clause of Section 18 makes it consistent with the remainder of Section 18. And it is not the failure to designate the larger proration unit that automatically terminates the lease as to the disputed quarter sections; the automatic termination is the result of the lease terms. The failure to designate the

additional acreage merely quantifies the amount of acreage as to which the lease provides for automatic termination.

After submission, we were advised by the parties that the El Paso Court of Appeals has issued an opinion in *Chesapeake Exploration, L.L.C. v. Energen Resources Corp.*, No. 08-13-00266-CV, 2014 WL 4931332 (Tex. App.—El Paso Oct. 1, 2014, no pet. h.). The issue in *Chesapeake* was whether oil and gas leases had partially terminated as to certain acreage covered by the leases. *Chesapeake*, 2014 WL 4931332, at *1. The leases provided that, when the continuous development periods ended, the leases would terminate as to all acreage except for "each proration unit established under . . . [the] rules and regulations [of the RRC . . . ] upon which there exists (either on the above described land or on lands pooled or unitized therewith) a well capable of producing oil and/or gas in commercial quantities." *Id.* at *4 (alterations in original). As of the dates that the continuous development periods ended, an operator of a well had designated all of the leased acreage as the well's proration unit in paperwork filed with the RRC. *Id.* at *1.

In *Chesapeake*, the court determined the intention of the parties as expressed in the leases. *Id.* at *3–7. Based on the language used in the leases, the court held that the leases had not partially terminated as to the acreage in dispute because all of the leased acreage was included in a designated proration unit when the continuous development periods ended. *Id.* at *4. The court explained that "the plain, grammatical language shows that the parties intended the leases to continue as to each designated proration unit if the unit had a well capable of producing gas in commercial quantities when continuous development ceased." *Id.* Our holding in this case is consistent with the reasoning of the *Chesapeake* court. In this case, the plain language of Section 18 required Endeavor to assign acreage to a well in a certified proration plat to maintain that acreage under lease. Additionally, this

14

case is factually distinguishable from *Chesapeake*. In *Chesapeake*, all of the leased acreage was included in a designated proration unit when the continuous development periods ended.

We conclude that Section 18 unambiguously required Endeavor to file, before the automatic termination date, a certified proration plat with the RRC that assigned acreage to a governmental proration unit in order to avoid having its mineral interests in that acreage revert back to the lessors. Because Endeavor did not file certified proration plats with the RRC that assigned the acreage in the disputed quarter sections by the automatic termination dates, the quantity of acreage that terminated under the lease includes the acreage in the disputed quarter sections. This case is similar to cases cited by Discovery and Patriot in which the courts held that the leases terminated because the lessee failed to comply with a requirement in the lease for maintaining it.[2] Discovery and Patriot established their right to summary judgment on their trespass to try title claim. The trial court did not err when it granted Appellees' motions for summary judgment and when it denied Endeavor's motion for summary judgment. Endeavor's issue is overruled.

---

[2]*See, e.g.*, *Samano v. Sun Oil Co.*, 621 S.W.2d 580, 584 (Tex. 1981) (lease terminated because the lessee's cessation of production for seventy-three days exceeded the lease's sixty-day cessation of production term); *Gulf Oil Corp. v. Reid*, 337 S.W.2d 267, 272 (Tex. 1960) (lease terminated because lessee did not timely pay a shut-in royalty required by lease); *Freeman v. Magnolia Petroleum Co.*, 171 S.W.2d 339, 342 (Tex. 1943) (lease terminated because lessee did not timely pay a royalty required by lease); *Sauder v. Frye*, 613 S.W.2d 63, 64 (Tex. Civ. App.—Fort Worth 1981, no writ) (lease terminated because lessee did not comply with lease provision that required him to execute in writing and to record an instrument identifying a pooled unit); *Appling v. Morrison*, 227 S.W. 708, 709 (Tex. Civ. App.—El Paso 1921, no writ) (lease terminated because lessee failed to pay a delay rental by the due date in the lease); *Ford v. Barton*, 224 S.W. 268, 269 (Tex. Civ. App.—Fort Worth 1920, no writ) (lease terminated because lessee failed to pay a delay rental by the due date in the lease); *Young v. Jones*, 222 S.W. 691, 694–95 (Tex. Civ. App.—El Paso 1920, no writ) (lease terminated because lessee failed to pay the correct delay rental payment required by the lease).

We affirm the order of the trial court.


JIM R. WRIGHT

CHIEF JUSTICE


October 23, 2014

Panel consists of: Wright, C.J.,
Bailey, J., and McCall.[3]

Willson, J., not participating.

---

[3]Terry McCall, Retired Justice, Court of Appeals, 11th District of Texas at Eastland, sitting by assignment.