ACCEPTED
04-15-00066-CV
FOURTH COURT OF APPEALS
SAN ANTONIO, TEXAS
6/15/2015 7:03:25 AM
KEITH HOTTLE
CLERK

No. 04-15-00066-CV

# In the Court of Appeals
# for the Fourth District of Texas
# San Antonio, Texas

FILED IN
4th COURT OF APPEALS
SAN ANTONIO, TEXAS
6/15/2015 7:03:25 AM
KEITH E. HOTTLE
Clerk

CONOCOPHILLIPS COMPANY,

*Appellant,*

v.

VAQUILLAS UNPROVEN MINERALS, LTD.,

*Appellee.*

From Cause No. 2014 CVQ000 438 D4
406th Judicial District Court, Webb County, Texas
Honorable Oscar J. Hale, Jr., Presiding Judge

## REPLY BRIEF OF APPELLANT, CONOCOPHILLIPS COMPANY

Michael V. Powell
  State Bar No. 16204400
  Email: mpowell@lockelord.com
Cynthia K. Timms
  State Bar No. 11161450
  Email: ctimms@lockelord.com
Elizabeth L. Tiblets
  State Bar No. 24066194
  Email: etiblets@lockelord.com
Locke Lord LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
Tel:   214-740-8520
Fax:   214-740-8800

Adolfo Campero
  State Bar No. 00793454
  Email: acampero@camperolaw.com
Campero & Associates, P.C.
315 Calle Del Norte, Suite 207
Laredo, Texas 78041
Tel:   956-796-0330
Fax:   956-796-0399

ATTORNEYS FOR APPELLANT
CONOCOPHILLIPS COMPANY

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................................... iii

QUESTION 1

In 1998, when the Railroad Commission adopted the Vaquillas Ranch (Lobo Cons.) Field Rules, how, at that time, did those rules *establish* any units *different from* 640 acres per producing or shut-in gas well, as required by Sentence (2) in the retained acreage clause? ........................................................1

QUESTION 2:

Then, in what sense had "different units" from 640 acres been *established* when ConocoPhillips' continuous drilling program ended, also as required by Sentence (2) of the retained acreage clause? ........................................................2

QUESTION 3:

If, as Vaquillas contends, the "manifest purpose" of the retained acreage clause was to effect a release of all acreage not drilled to the *maximum* density allowed by Railroad Commission rules (*i.e*, one well each 40 acres), why does the clause not just say that? ....................................................................2

QUESTION 4:

Why doesn't Vaquillas's proposed interpretation of the retained acreage clause violate the long-established rule that "we will not hold the lease's language to impose a special limitation on the grant unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning? ....................................................................................................................4

ADDITIONAL REPLIES TO VAQUILLAS'S BRIEF...........................................7

    Vaquillas's "Suggestions" about the Field Rules............................................7

    Vaquillas's Erroneous Interpretation of the Retained Acreage Clause.........10

PRAYER FOR RELIEF .......................................................................................16

CERTIFICATE OF COMPLIANCE....................................................................18

CERTIFICATE OF SERVICE .............................................................................19

# INDEX OF AUTHORITIES

**Page(s)**

**CASES**

*Anadarko Petroleum Corp. v. Thompson*,
94 S.W.3d 550 (Tex. 2002)................................................................................5

*Birnbaum v. SWEPI LP*,
48 S.W.3d 254 (Tex. App.—San Antonio, pet. denied)...................................14

*Chesapeake Exploration, L.L.C. v. Energen Resources Corp.*,
445 S.W.3d 878 (Tex. App.—El Paso 2014, no writ)........................................5

*ConocoPhillips Co. v. Ramirez*,
2006 WL 1748584 (Tex. App.—San Antonio 2006) (not designated for
publication) ....................................................................................................11

*Endeavor Energy Resources, L.P. v. Discovery Operating, Inc.*,
448 S.W.3d 169 (Tex. App.—Eastland 2014, pet. filed) ..............................5, 15

*Fox v. Thoreson*,
398 S.W.2d 88 (Tex. 1966)................................................................................5

*Plains Exploration & Production Co. v. Torch Energy Advisors Inc.*,
No. 13-0597, Slip op. (Tex., June 12, 2015) ......................................................6

*Rogers v. Ricane Enterprises, Inc.*,
772 S.W.2d 76 (Tex. 1989)................................................................................5

*Springer Ranch, Ltd. v. Jones*,
421 S.W.3d 273 (Tex. App.—San Antonio 2013, no pet.) ..............................11

*Terrill v. Tuckness*,
985 S.W.2d 97 (Tex. App.—San Antonio 1998, no writ)...................................6

**OTHER AUTHORITIES**

16 T.A.C. § 3.37 (Statewide Rule 37) ...................................................................9

16 T.A.C. § 3.38 (Statewide Rule 38) .........................................................1, 9, 12

Scott Lansdown, *Continuous Development/Retained Acreage Clauses in Oil and Gas Leases, Including Drilling Requirements, Acreage and Depth Retention Terms and Related Matters*, 64th OIL & GAS INST. 291 (Matthew Bender 2013) ....................................................................................4

Scott C. Petry, *Drafting the Retained Acreage Clause: The Effect of Governmental Authority on Retained Acreage*, State Bar of Texas Advanced Oil, Gas and Energy Resources Law Course p. 6 (2009)..................11

2 E. Smith & J. Weaver, TEXAS LAW OF OIL AND GAS (LexisNexis 2014) ..............4

<u>**CONOCOPHILLIPS' REPLY BRIEF**</u>

TO THE HONORABLE COURT OF APPEALS:

The Appellee's Brief filed by Vaquillas Unproven Minerals, Ltd. ("Vaquillas") fails to come to grips with four important questions:

**1. In 1998, when the Railroad Commission adopted the Vaquillas Ranch (Lobo Cons.) Field Rules, how, at that time, did those rules *establish* any units *different from* 640 acres per producing or shut-in gas well, as required by Sentence (2) in the retained acreage clause?**

The answer is: "they did not." As ConocoPhillips has explained, the only proration or spacing units specified by the Field Rules were minimum, 40-acre drilling units for obtaining permits to drill new wells. Those "drilling units" had no application to ConocoPhillips' already-drilled and producing gas wells in this Field. Furthermore, the 40-acre minimum for drilling units was derived by applying the Field Rules' spacing rule to the Table in Statewide Rule 38, the same rule that applied before the Field Rules were adopted. 16 T.A.C. § 3.38(b)(2)(A). Consequently, when the Field Rules were adopted, all existing wells had already been drilled in compliance with those same minimum drilling unit requirements.

Unlike many other field rules, the Field Rules applicable in this case "established" *nothing* about the maximum number of acres that could be assigned to, or associated with, already-producing or shut-in gas wells in the Field.

1

**2.    Then, in what sense had "different units" from 640 acres been *established* when ConocoPhillips' continuous drilling program ended, also as required by Sentence (2) of the retained acreage clause?**

The answer is: "in no sense." There was nothing inconsistent or conflicting between the Field Rules and the agreement in Sentence (1) of the retained acreage clause that ConocoPhillips could retain 640 acres around each producing and shut-in gas well at the time the retained acreage clause operated.

Grammatically, the phrase, "such *established* different units shall be held under this lease by such production, in lieu of the . . . 640 units above mentioned," is in the past tense, *i.e.*, it refers to "different units" already "established" before it became time for the retained acreage clause to operate. But under Vaquillas's incorrect reading of the clause, "different units" would be "established" only in the present, *at* the time the retained acreage clause operates, and would be "established" *by* the operation of the retained acreage clause clause, not as the result the Commission's adopting of Field Rules years earlier.

**3.    If, as Vaquillas contends, the "manifest purpose" of the retained acreage clause was to effect a release of all acreage not drilled to the *maximum* density allowed by Railroad Commission rules (*i.e*, one well each 40 acres), why does the clause not just say that?** (*See* Vaquillas Brief pp. 7, 28-29).

2

Vaquillas's alleged "manifest purpose" could clearly and easily have been written into the retained acreage clause as follows:

> ". . . Lessee covenants and agrees to execute and deliver to Lessor a written release of any and all portions of this lease which have not then been drilled to the maximum density allowed by Railroad Commission rules."

That is, in effect, what Vaquillas claims the retained acreage clause means on page 28 of its Brief; but that, of course, is a far cry from what the retained acreage clause actually says.

Vaquillas's argument that when the parties executed these Leases, they intended to effect a release of all portions of the leases not drilled to the maximum lawful density of one well per each 40 acres conflicts directly with Sentence (1) of the retained acreage clause, which states the lessee retains *640* acres for each producing or shut-in gas well. Indeed, the language of Sentence (1) states precisely that the lessee will release "any and all portions of this lease *which have not been drilled to a density of at least . . . 640 acres* for each producing and shut-in gas well." If the parties meant "drilled to a density of 40 acres" instead of 640 acres, as Vaquillas now contends, it would have been easy to make that change. Sentence (1) of the retained acreage clause, along with pooling clause's providing for pooling of 640 acres for gas wells, demonstrates the parties' acceptance that the

norm for gas well development on the Vaquillas Leases would be one well per 640 acres.[1]

**4.     Why doesn't Vaquillas's proposed interpretation of the retained acreage clause violate the long-established rule that "we will not hold the lease's language to impose a special limitation on the grant unless the language is so clear, precise, and unequivocal that we can reasonably give it no other meaning?"**

Rather than answer this question, Vaquillas tries to side-step it on pages 26-27 of its Brief.  Vaquillas says the Court should dismiss the rule as having "no application here" and "no practical effect in the construction of an unambiguous contract."  But the Texas Supreme Court does not require a finding of ambiguity before applying the rule, and as ConocoPhillips has already briefed, Texas courts

---

[1]  Retaining 640 acres for gas wells is customary in the industry.  Mr. Lansdown, in his article, *Continuous Development/Retained Acreage Clauses in Oil and Gas Leases, Including Drilling Requirements, Acreage and Depth Retention Terms and Related Matters*, 64th OIL & GAS INST. 291 (Matthew Bender 2013), states "the standard amounts [of acreage retained under Continuous Development Clauses] were . . . 640 acres for each producing gas well (plus a 10%) tolerance."  *Id.* at 314 n. 87.  (Lansdown's article uses the phrase "Continuous Development Clause" to include both a continuous development clause and the retained acreage clause that operates when the continuous development program ends.  *Id.* at 296.)

Professors Smith and Weaver state:  "Typically, one oil well is allowed on a 40-acre tract, and one gas well on a 640-acre tract."  2 E. Smith & J. Weaver, TEXAS LAW OF OIL AND GAS § 8.2(D)(2) (LexisNexis 2014).

frequently have applied the rule to interpret retained acreage clauses. (ConocoPhillips' opening Brief p. 30).

In *Anadarko Petroleum Corp. v. Thompson*, 94 S.W.3d 550 (Tex. 2002) (from which the quotation in Question 4, above, comes)  the Court expressly described the lease at issue as *un*ambiguous, yet applied the rule.  *Id.* at 554-56. There was no determination of ambiguity in *Rogers v. Ricane Enterprises, Inc.*, 772 S.W.2d 76 (Tex. 1989).  Rather, the Court applied the rule to construe an assignment as a matter of law.  *Id.* at 79.  The same was true in *Fox v. Thoreson*, 398 S.W.2d 88 (Tex. 1966), in which the Court described the rule as a "sound rule of interpretation" and then applied it to construe a lease as a matter of law.  *Id.* at 92.

More recently, in *Chesapeake Exploration, L.L.C. v. Energen Resources Corp.*, 445 S.W.3d 878 (Tex. App.—El Paso 2014, no writ), discussed on page 30 of ConocoPhillips' opening brief, the El Paso Court did not find any ambiguity in two oil and gas leases, *id.* at 881 n. 3, but nevertheless applied the rule in interpreting a retained acreage clause in those leases.  *Id.* at 883.[2]

---

[2]  Vaquillas's reliance at page 27 of its Brief on *Endeavor Energy Resources, L.P. v. Discovery Operating, Inc.*, 448 S.W.3d 169 (Tex. App.—Eastland 2014, pet. filed), is misplaced.  As interpreted by the Eastland Court, the retained acreage clause in that lease unambiguously obligated the lessee to file a certified proration plat for each well with the Railroad Commission, and the clause then allowed the operator to retain only the specific acreage the operator had

5

This Court described the procedure for deciding whether a contract is ambiguous in *Terrill v. Tuckness*, 985 S.W.2d 97, 102-03 (Tex. App.—San Antonio 1998, no writ) (stating: "An instrument is ambiguous *only* when the application of the rules of construction leaves it unclear which meaning is the correct one." (emphasis in original)). *Accord, Plains Exploration & Production Co. v. Torch Energy Advisors Inc.*, No. 13-0597, Slip op. at 14-15 (Tex., June 12, 2015) ("if the contract is subject to two or more reasonable interpretations after applying the pertinent construction principles, the contract is ambiguous, creating a fact issue regarding the parties intent.").

Consequently, contrary to Vaquillas's argument, this Court should construe the exception in the retained acreage clause in a manner that avoids requiring ConocoPhillips to forfeit 15,000 additional acres from the mineral estate Vaquillas granted to it by the Vaquillas Leases. The exception in Sentence (2) of the retained acreage clause does not require the result for which Vaquillas contends at all, much less so clearly, precisely, and unequivocally that the exception can be given no other meaning.

---

designated on that plat. *Id.* at 178-79. The Vaquillas Leases contain no such requirement.

## ADDITIONAL REPLIES TO VAQUILLAS'S BRIEF

Vaquillas's Brief not only fails to answer (or answer correctly) the four questions listed above, it embellishes the record of the Commission's adoption of Field Rules for the Vaquillas Ranch (Lobo Cons.) Field, and proposes to this Court an awkward and incorrect interpretation of the retained acreage clause that this Court should not accept.

ConocoPhillips will address both flaws in Vaquillas's arguments.

### Vaquillas's "Suggestions" about the Field Rules

Vaquillas suggests that when the Commission adopted the Field Rules, the Commission "considered the evidence and applied its expertise" to make a determination that gas wells in this Field drain only 40 acres, should be drilled every 40 acres, or that 40 acres was "the appropriate density of development" for the Vaquillas Ranch. *See, e.g.*, Vaquillas Brief pp. 3-4 n.3, 28. For those kinds of statements in its Brief, Vaquillas cites only to the Commission's Examiner's Report and Recommendation on the original Field Rules and to Rule 2 in the Field Rules, itself. *See* Vaquillas Brief p, 3, *citing* Conclusion of Law No. 3 in the Examiner's Report (CR252 ¶ 3) and Vaquillas Brief pp. 3-4 n. 4, citing only to Rule 2 of the Field Rules (CR247).

The record does not support Vaquillas's argument. Conclusion of Law No. 3 in the Examiner's Report and Recommendation states only that "[a]pproval of

7

the proposed field consolidation, adoption of the proposed field rules and suspension of the allocation formula will prevent waste and will not harm correlative rights." (CR252 ¶3). And then, far from decreeing there should be a gas well drilled every 40 acres in this Field, Field Rule 2 states: "The aforementioned distances in the above rule [467 feet from a lease line and 1,200 feet between wells] are *minimum* distances to allow an operator flexibility in locating a well."

One can search the Examiner's Report (CR250) and the Field Rules (CR252) in vain for any reference to evidence that was offered or considered by the Commission about the spacing rules in Rule 2 of the Field Rules or any "appropriate density of development" for the Vaquillas Ranch ( Lobo Cons.) Field. The purpose of these particular Field Rules was to consolidate 56 previously-designated Lobo gas fields into a single field so that wells in the Field could continue to produce to lower economic limits, thereby resulting in higher gas volumes per well. *See* the "Discussion of the Evidence" and Findings of Fact 2-7 in the Examiner's Report and Recommendation (CR251-52).

Nothing in the record indicates that when the Commission promulgated the spacing rule in Rule 2 of the Field Rules, it did any more than carry the standard, Statewide Rule 37 distances of 467 and 1,200 feet forward into these Field Rules. The spacing in these Field Rules requires reference to the very same Table in

Statewide Rule 38 for minimum drilling units as Statewide Rule 37 required before these Field Rules were adopted. *See* 16 T.A.C § 3.37(a)(1) & 3.38(b)(2). So, both the Statewide spacing rule in effect before the Field Rules were adopted (467-1,200) and the spacing rule of the Field Rules (467-1,200) point to the very same line in the Table in Statewide Rule 38, which requires minimum drilling units of 40 acres for both oil and gas wells.

In effect, Vaquillas's argument about the Field Rules proves too much. If the Commission "found" that the minimum 40-acre density specified by Statewide Rule 38 was the "appropriate density of development" by adopting these Field Rules, surely Statewide Rules 37 and 38 would have led these parties to the same conclusion years before, when the Vaquillas Leases were executed.[3] If the parties' intent at that time was to require the lessee to drill the Vaquillas acreage to the maximum lawful density, that maximum density was exactly the same—40 acres per well—when the Leases were signed. If that had been the parties' intent, they could easily and clearly have stated that "intent" in the retained acreage clause, but did not. (*See* Question No. 3 in this Reply Brief, above).

---

[3] Vaquillas placed into the record of this case the original Special Order of the Railroad Commission, dated August 15, 1955, which established minimum, 40-acre "acreage requirements" for spacing rules of 467 feet from a lease line and 1,200 feet between wells. (*See* CR269, stating that "no well shall be drilled on less acreage" than acreages specified in the table). Consequently, the same minimum 40-acre density requirement has been in effect throughout the time both Vaquillas Leases have existed.

**Vaquillas's Erroneous Interpretation of the Retained Acreage Clause**

Vaquillas offers, throughout its Brief, a meat-cleaver approach to interpretation of the Vaquillas Leases. Vaquillas tells the Court that Sentences (1) and (2) of the retained acreage clause apply to mutually-exclusive situations and have no relationship to each other. Consequently, Vaquillas says that if the Commission has adopted field rules and those rules identify, for *any* purpose, *any* unit of acreage "different from" 640 acres for gas wells, then Sentence (2) controls to the complete exclusion of both Sentence (1) and all other provisions of the Leases that are inconsistent with the forfeiture Vaquillas seeks to effect by its proposed reading of Sentence (2).

Vaquillas points to the spacing rule in the Field Rules and then to Statewide Rule 38 and says *only* that the minimum 40-acre drilling unit created by reading those rules together is "different from" 640 acres. Vaquillas says "never mind" to the obvious fact that a 40-acre minimum drilling unit has nothing to do with, and does not conflict in any way with, carrying out of the parties' agreement in Sentence (1) that the lessee retains 640 acres for gas wells when the retained acreage clause operates.

There is no conflict between two unrelated purposes of: (a) requiring a minimum of 40 acres for drilling a new well,[4] and (b) retaining 640 acres for each producing and shut-in gas well at the time the retained acreage clause operates. This Court drew the correct distinction between those different purposes of the two provisions in *Ramirez,* when it wrote that Statewide Rules (just like these Field Rules) "merely establish minimum spacing and density requirements," but the retained acreage clause "establishes the acreage the lessee is entitled to hold" when that clause operates. *ConocoPhillips Co. v. Ramirez*, 2006 WL 1748584 at \*3 (Tex. App.—San Antonio 2006) (not designated for publication).

Stripped to its core, Vaquillas's argument is mind-numbingly simplistic: "40" is different from "640." That argument, which lacks even a semblance of substance, should be rejected by this Court. To accept Vaquillas's argument would *not* be "avoiding when possible and proper a construction which is unreasonable, inequitable, and oppressive." *Springer Ranch, Ltd. v. Jones*, 421 S.W.3d 273, 280 (Tex. App.—San Antonio 2013, no pet.).

---

[4] One author recently explained a "drilling unit" as follows: "A 'drilling unit' is the 'acreage assigned to a well for drilling purposes' and is the acreage submitted with the RRC Form W-1 drilling permit to show sufficient acreage for density requirements. It is a regulatory term of art with limited purposes and it is not even required for permits on vertical wells anymore." Scott C. Petry, *Drafting the Retained Acreage Clause: The Effect of Governmental Authority on Retained Acreage*, State Bar of Texas Advanced Oil, Gas and Energy Resources Law Course p. 6 (2009).

On pages 17-18 of its Brief, Vaquillas tries to make a play on the words "prescribed" and "requirement" that are found in Statewide Rule 38. Because Vaquillas finds those words, which it says are close enough to "establish," it claims the Field Rules do, in fact, "establish" different units. Not true. First, the words Vaquillas has found are in Statewide Rule 38, *not* in the Field Rules. But more importantly, Vaquillas omits to acknowledge the sole purpose for which Statewide Rule 38 "prescribes" standard drilling units and "requires" a minimum of 40 acres in those units. As the text of the Rule makes crystal clear, that purpose is to define a "standard unit" in order to explain the Rule's "general prohibition," which is that "no well shall be drilled on substandard acreage." 16 T.A.C. § 3.38(b)(1). "Substandard acreage" is defined to mean "less acreage than the smallest amount established for standard or optional drilling units." 16 T.A.C § 3.38(a)(4). So the purpose of the words in Rule 38 is only to say the Commission will not issue drilling permits for tracts smaller than those prescribed in the Table.

In other sections of its Brief, Vaquillas strives to explain away the obvious inconsistencies that ConocoPhillips's original Brief pointed out between Vaquillas's interpretation of Sentence (2) of the retained acreage clause and other provisions of the Leases. In each case, Vaquillas dismisses the inconsistency by claiming that when the exception in Sentence (2) applies, other provisions of the Lease that conflict with Vaquillas's interpretation of Sentence (2) simply go away.

*See* Vaquillas Brief p. 21 ("That any drilling unit established as the result of Field-Rule spacing would likely be less than 640 acres does not create surplusage"); p. 23 ("The 640-acre pooling authorization is not rendered surplusage"); p. 24 ("The requirement that each retained unit contain 'at least' one well is not rendered surplusage"); and p. 25 (That a particular Field-Rule spacing establishes the drilling unit for gas wells at the same acreage as the drilling unit for oil wells does not create surplusage"). *See also* Vaquillas Brief pp. 6-7.

Vaquillas agrees these other clauses—such as the pooling clause and the one-well-per-retained-block-of-contiguous-acreage requirement in Sentence (4) of the retained acreage clause—are rendered meaningless under Vaquillas's interpretation of Sentence (2). Yet Vaquillas insists these clauses are not true "surplusage" because they apply when Sentence (2) does not, but only then. They become "surplusage" in Vaquillas's mind only when the exception in Sentence (2) applies. Vaquillas explains this theory most pointedly on page 6 of its Brief: "An exception that renders a default provision inapplicable under some, or even most, circumstances dose not thereby render the default provision superfluous."

Obviously, Vaquillas's proposed interpretation is a strained one, not in keeping with the rule that a contract should be interpreted so that none of its provisions is rendered superfluous, or the rule that the Court should "consider each part [of the lease] with every other part so that the effect and meaning of one part

on any other part may be determined." *Birnbaum v. SWEPI LP*, 48 S.W.3d 254, 257 (Tex. App.—San Antonio, pet. denied).

Vaquillas's argument improperly isolates Sentence (2) of the retained acreage clause from other provisions of the Vaquillas Leases and exalts an *exception* into a super-powerful clause that overrides other provisions of the Leases. In effect, Vaquillas tries to turn the "exception" into the "rule," and the "rule" into the exception.

Indeed, Vaquillas turns the retained acreage clause on its head. Vaquillas refers throughout its Brief to the 640 acres agreement in Sentence (1) as the "*default* retention" or the "*default* retained-acreage provision" (rather than the parties' basic agreement about the quantity of acreage that may be retained, as it plainly is). Vaquillas writes that Sentence (2) "will override the default provision [by which Vaquillas means Sentence (1)] where a formally-adopted rule for the field provides for a spacing that establishes *a* [by which Vaquillas obviously means "any"] unit of acreage less than 640 acres." Vaquillas Brief p. 22.

That is an unreasonable construction of this retained acreage clause. The reasonable interpretation, which gives meaning to all provisions of the clause, as well as the pooling clause, the one well clause, and other provisions of the Leases, is that the general rule governs, thereby allowing ConocoPhillips to retain 640 acres per gas well, unless the Commission adopts a field rule that overrides the

14

parties' agreement that ConocoPhillips may hold 640 acres with gas wells, or in the language of the clause "establishes" different units of acreage that must, by law, be observed for gas wells instead of the 640 acres to which the parties agreed.

For examples, the field rules described in the three Supreme Court cases described on page 23 of ConocoPhillips' opening brief required operators to assign fewer than 640 acres to producing wells. The rules in those cases permitted maximum 320, 160, and 352-acre producing units. If those field rules applied here, the retained acreage clause in the Vaquillas Leases would reduce the acreage ConocoPhillips could retain for gas wells. But the Field Rules at issue here contain no such provisions. As another example, the field rules for the Spraberry (Trend Area) Field quoted in *Endeavor Energy Resources, L.P.*, discussed on page 27 of Vaquillas's Brief, stated: "The standard drilling and proration units are established hereby to be EIGHTY (80) ACRES except as herein provided. No proration unit shall consist of more than EIGHTY (80) ACRES except as hereinafter provided." *Endeavor*, 448 S.W.3d at 173. If the Vaquillas Ranch (Lobo Cons.) Field Rules had a similar provision, that, too, legally would modify the parties' agreement that ConocoPhillips could retain 640 acres, but they do not.

There is no friction between the Field Rules for the Vaquillas Ranch (Lobo Cons.) Field and these parties' plainly-stated agreement that ConocoPhillips may retain 640 acres for each gas well that it drilled before the end of its continuous

15

drilling program (and that remains producing or shut-in). ConocoPhillips can retain 640 acres per producing or shut-in gas well, yet comply in every respect with these Field Rules, just like it complied with the very same spacing and density requirements before these Field Rules were adopted.

A final comment on Vaquillas's statement that ConocoPhillips has advanced a supposedly "Shylockian interpretation." Obviously pleased with its Shakespearean reference, Vaquillas summons the Bard's merciless moneylender to center stage four times in its Brief. But Vaquillas is trying to write Shylock into the wrong play.

ConocoPhillips has never argued, as Vaquillas asserts for its reference to Shylock, that Sentence 2 applies only if "Rule 38 (through which Field Rule operates to establish density) prescribed fixed units of acreage that could not be varied in either direction by the operator." Vaquillas Brief p. 14. ConocoPhillips has said the exception in Sentence (2) would come into play if the Railroad Commission had "established" by Field Rules different units that made it legally necessary to modify the parties' agreement that ConocoPhillips may retain 640 acres for each producing or shut-in gas well. That simply did not happen.

## PRAYER FOR RELIEF

ConocoPhillips respectfully restates the Prayer for Relief contained on pages 31-32 of its original Brief.

Respectfully submitted,


*/s/ Michael V. Powell*

Michael V. Powell
  State Bar No. 16204400
  Email: mpowell@lockelord.com
Cynthia K. Timms
  State Bar No. 11161450
  Email: ctimms@lockelord.com
Elizabeth L. Tiblets
  State Bar No. 24066194
  Email: etiblets@lockelord.com
Locke Lord LLP
2200 Ross Avenue, Suite 2200
Dallas, Texas 75201-6776
Tel: 214-740-8520
Fax: 214-740-8800

Adolfo Campero
  State Bar No. 00793454
  Email: acampero@camperolaw.com
Campero & Associates, P.C.
315 Calle Del Norte, Suite 207
Laredo, Texas 78041
Tel: 956-796-0330
Fax: 956-796-0399

**ATTORNEYS FOR APPELLANT CONOCOPHILLIPS COMPANY**

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), as amended effective December 1, 2012, the undersigned certifies that this Petition complies with the length limitations of Rule 28.3(g) (which the undersigned understands now to be stated in Rule 9.4(i)) and the typeface requirements of Rule 9.4(e).

1. Exclusive of the contents excluded by Rule 9.4(i)(1), this Brief contains 4,790 words as counted by the Word Count function (including textboxes, footnotes, and endnotes) of Microsoft Office Word 2010.

2. This Brief has been prepared in proportionally spaced typeface using:

Software Name and Version: Microsoft Office Word 2010
Typeface Name: Times New Roman
Font Size: 14 point

*/s/ Michael V. Powell*
Michael V. Powell

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 15th day of June, 2015, a true and correct copy of Reply Brief of Appellant, ConocoPhillips Company, was served by eFile Texas and/or pdf on Appellees through its counsel of record listed below:

Gregg Owens
  Email: gregg.owens@haysowens.com
Robert G. Hargrove
  Email: rob.hargrove@haysowens.com
Hays & Owens L.L.P.
807 Brazos Street, Suite 500
Austin, Texas   78701
Tel: 512.472.3993
Fax: 512.472.3883

Raul Leal
  Email: rleal@rl-lawfirm.com
Raul Leal Incorporated
5810 San Bernardo, Suite 390
Laredo, Texas 78041
Tel: 956-727-0039
Fax: 956-727-0369

A. Michael Jung
  Email: michael.jung@strasburger.com
Strasburger & Price, LLP
901 Main Street, Suite 4400
Dallas, Texas 75202-3794
Tel: 214-651-4724
Fax: 214-651-4330 (main)
Fax: 214-659-4022 (direct)

Armando X. Lopez
  Email: mandox@rio.bravo.net
Law Offices of Armando X. Lopez
1510 Calle Del Norte, Suite 16
Laredo, Texas  78041
Tel:  956-726-0722
Fax:  956-726-6049

*Counsel for Vaquillas Unproven Minerals, Ltd.*

*/s/ Michael V. Powell*
Michael V. Powell